**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **THOMAS HEALTH SYSTEM, INC.,** | Case No. 20-20007 (FWV) |
| Debtor. | (Joint Administration Requested) |
| **In re:** | Chapter 11 |
| **HERBERT J. THOMAS MEMORIAL HOSPITAL ASSOCIATION,** | Case No. 20-20008 (FWV) (Joint Administration Requested) |
| Debtor. | |
| **In re:** | Chapter 11 |
| **CHARLESTON HOSPITAL, INC.,** | Case No. 20-20009 (FWV) |
| Debtor. | (Joint Administration Requested) |
| **In re:** | Chapter 11 |
| **THS PHYSICIAN PARTNERS, INC.,** | Case No. 20-20010 (FWV) |
| Debtor. | (Joint Administration Requested) |

**DECLARATION OF DANIEL J. LAUFFER
IN SUPPORT OF CHAPTER 11 PETITIONS
AND FIRST DAY MOTIONS AND APPLICATIONS**

I, Daniel J. Lauffer, hereby declare as follows:

1.      I am President and Chief Executive Officer of Thomas Health System, Inc. ("<u>THS</u>"), a West Virginia nonprofit public benefit corporation headquartered in Charleston, West Virginia.

2.      THS is the sole member of the Herbert J. Thomas Memorial Hospital Association ("<u>Thomas Memorial</u>") and Charleston Hospital, Inc. d/b/a Saint Francis Hospital ("<u>Saint Francis</u>," together with Thomas Memorial are hereinafter referred to as the "<u>Hospitals</u>").

3.      THS Physicians Partners, Inc., ("THSPP") is a related entity that provides ancillary services to the Hospitals, as described more fully below.  I am an authorized representative of THSPP.  THSPP, THS, Thomas Memorial and Saint Francis collectively are referred to as the "Debtors" or "Debtors-In-Possession".

4.      In my role with the Debtors, I am familiar with their day-to-day operations, businesses and financial affairs.

5.      I am submitting this Declaration in support of the Debtors' First Day Motions (defined below).  Capitalized terms not defined in this Declaration shall have the meanings ascribed to the term in the relevant First Day Motion.  I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted business operations of the Debtors and to the Debtors' reorganization efforts.

6.      Except as otherwise indicated, all statements set forth in this Declaration are based upon my knowledge as President and CEO of THS, my roles with Thomas Memorial, St. Francis, and THSPP, information supplied to me by other representatives of the Debtors' management team and/or Debtors' professionals, my review of relevant documents and/or my opinion based upon my experience and knowledge of the Debtors' operations, financial affairs, and understanding of the industry.  If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized by the Debtors to submit this Declaration.

### A.  COMMENCEMENT OF THE CHAPTER 11 PROCEEDINGS.

7.      On January 10, 2020, (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*.

(the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of West Virginia (the "Court").

8.    As of the Petition Date, the Debtors remain in possession of their assets and continue to manage their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these chapter 11 cases (the "Chapter 11 Cases"), and no committee has been appointed at this time. Concurrently with the filing of this Declaration, the Debtors have requested procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

9.    The Chapter 11 Cases were filed to preserve and enhance the enterprise value of the Debtors and further the Debtors' mission of delivering compassionate and exceptional care to the communities they serve.  Due to macro issues negatively affecting the delivery of healthcare in West Virginia, implementation of the Affordable Care Act, the decline of the coal industry and corresponding job losses, Medicaid expansion, reduced reimbursement rates for healthcare services, patient outmigration, as well as a host of other issues arising from changes in the healthcare laws over the past decade, the Debtors have experienced significant financial challenges in recent years.  Those challenges, coupled with the burden of servicing an overwhelming amount of indebtedness, have impaired the Debtors' ability to meet important working capital and operational needs, maintain ordinary course business relationships, pursue strategic opportunities, recruit medical professionals, and otherwise reinvest in their operations and facilities in order to grow revenue to further their mission.

10.    To illustrate, the Debtors' annual debt service obligation on its Hospital Revenue Improvement Bonds (Thomas Health System, Inc.) Series 2008 (the "Bonds") was $10,793,950 in

3

2019, of which $9,138,950 was attributable to interest and $1,655,000 was attributable to principal.

Since the 2008 issuance of the $148,920,000 in Bonds, the Debtors have paid $108,108,000

resulting in a reduction in principal of approximately $11,010,000.  Notably, the Bonds originally

were sold at a discount – meaning that the bondholders purchased $148,920,000 in Bonds at the

time of issuance for $146,807,927 (a discount of $2,112,073).  Historically, the Debtors have paid

approximately $8,091,500 per year in interest alone.  As of the Petition Date, the principal amount

outstanding on the Bonds is approximately $137,910,000, although such amount may be lower

due to a possible setoff of $5,820,008 swept from the Debtors' debt service reserve fund in March

2019.

11.    Additionally, these Chapter 11 Cases were filed to preserve certain restructuring

options.  The Debtors, with the assistance of its legal counsel Whiteford Taylor Preston, LLP,

investment banker SOLIC Capital Advisors, and financial advisor Force Ten Partners, LLC, have

explored both strategic transactions and refinancing options over the past year.  As the terms of

certain proposals contain covenants that require prompt action, the Debtors have filed these

Chapter 11 Cases to preserve and potentially avail themselves of such opportunities.

12.    The Debtors have filed the following motions (collectively, the "First Day

Motions")[1] to enable them to efficiently administer their estates with minimal disruption and loss

of value during the Chapter 11 Cases:

- *Debtors' Motion for an Order Directing Joint Administration of Their Related Chapter 11 Cases*

- *Debtors' Motion for Entry of an Order: (I) Authorizing Debtors to File a Consolidated Creditor Matrix; (II) Authorizing Debtors to File a Consolidated List of Debtors' 30 Largest Unsecured Creditors; (III) Authorizing Certain Procedures to Maintain the Confidentiality of Patient Information as Required by Privacy Rules; (IV) Establishing Patient Notice*

---

1.    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

4

*Procedures; and (V) Approving the Form and Manner of the Notice of Commencement of Chapter 11 Cases*

- *Debtors' Motion for Entry of Interim and Final Orders: (A) Authorizing the Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits; (B) Confirming that the Debtors May Continue Prepetition Employee Programs and Pay Employees in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor all Related Checks and Electronic Payment Requests*

- *Debtors' Motion for Entry of Interim and Final Orders: (I) Authorizing Debtors to Maintain Existing Bank Accounts and Business Forms and Continue to Use Existing Cash Management System; (II) Granting Administrative Expense Status for Intercompany Claims; and (III) Waiving the Requirements of Section 345(b) of the Bankruptcy Code*

- *Debtors' Motion for Entry of Interim and Final Orders: (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Service; (II) Deeming Utility Companies Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance*

- *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to: (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto; (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; (III) Honor the Terms of the Premium Financing Agreements and Pay Premiums Thereunder; and (IV) Enter Into New Premium Financing Agreements in the Ordinary Course of Business.*

- *Debtors' Motion for Entry of Interim and Final Orders Authorizing (I) Debtors to Pay Certain Prepetition Taxes and Fees and (II) Financial Institutions to Honor and Process Related Checks and Transfers*

- *Debtors' Application to Employ and Retain Omni Management Group as Notice, Claims and Solicitation Agent*

The Debtors anticipate filing one or more additional motions in the days to follow the Petition Date, including, without limitation the *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to Use Cash Collateral, Granting Adequate Protection and Scheduling A Final Hearing Thereon.*

13.     Part I of this Declaration describes the Debtors' businesses, financial information and organizational structure.    Part II of this Declaration explains the Debtors' existing indebtedness.   Part III describes the circumstances that led to the commencement of the Chapter 11 Cases.  Part IV sets forth certain facts in support of the First Day Motions.

**Part I:  Overview of the Debtors' Business Operations,
Financial and Organization Structure**

**a.      The Debtors**

(I)      Thomas Health System, Inc.

14.     THS is a nonstock, nonprofit corporation duly incorporated under the laws of the State of West Virginia.  THS was formed in December 2006 in anticipation of the purchase of Saint Francis by Thomas Memorial (described below).   THS is the consolidated parent entity/holding company whose primary function is to serve as the controlling body of the affiliated Debtors.  It is the sole parent of Thomas Memorial and Saint Francis.  The executive offices for THS are located at 4605 MacCorkle Avenue SW, South Charleston, West Virginia, 25309.

15.     THS is the 17th largest private employer in West Virginia.  The Debtors collectively form a 391-bed hospital system that employs nearly 1700 full and part-time employees and an estimated 250 clinicians.

16.     THS's mission is to be the trusted, personal choice for wellness and quality care, focused on optimal individual health as well as enhancement of community wellness as a whole. THS consistently aspires to deliver an exceptional and compassionate patient experience, with superior clinical outcomes provided by engaged physicians and staff.

17.     THS is committed to maintain the highest standard of service, while continuing the missions of both Thomas Memorial and Saint Francis.  Together, these acute care Hospitals

provide advanced technology to a larger community, with greater access to the highest quality of medical care.

         (II)    <u>Thomas Memorial</u>

18.    Thomas Memorial is a nonstock, not-for-profit corporation duly incorporated under the laws of the State of West Virginia.  It opened in 1946.  Thomas Memorial owns and operates health care facilities on its approximately 17-acre campus located in South Charleston, West Virginia. Thomas Memorial was named in memory of a South Charleston resident and West Virginia's Congressional Medal of Honor winner, Marine Corps Sergeant Herbert J. Thomas, Jr., who died in World War II after falling on a grenade to save his fellow soldiers.

19.    At the time of the issuance of the Bonds, Thomas Memorial was an acute care community hospital with approximately 890,000 square feet of space that provided a comprehensive range of medical and surgical inpatient, emergency, and outpatient services. Thomas Memorial had 249 total beds, including 148 medical/surgical acute care, 16 critical care, 20 rehabilitation, 19 obstetrics, 18 behavioral health, 15 pediatric, and 5 level II intensive care nursery beds.

         (III)    <u>St. Francis</u>

20.    Saint Francis is a nonstock, not-for-profit corporation duly incorporated under the laws of the State of West Virginia.  Saint Francis owns and operates health care facilities on its approximately nine-acre campus, which is located in Charleston, West Virginia.

21.    Saint Francis was first-organized in 1913, and is focused on faith-based health care. The acute cure community hospital has approximately 550,000 square feet of space that provides a comprehensive range of medical and surgical inpatient, emergency and outpatient acute services. Inpatient services include acute medical and surgical, ICU/CCU and skilled nursing. The main

campus houses two Therapeutic Cardiac Catheterization Labs, an Ambulatory Surgery Center, a Pain Management Center, a fixed MRI Facility and a Wound Care Center in addition to traditional acute care outpatient services.  At the time of the Bond issuance, Saint Francis' bed capacity was 142 beds, including 98 medical/surgical acute care, 15 critical care, and 29 skilled nursing beds.

22.     On January 1, 2007, Saint Francis joined THS when Thomas Memorial purchased Saint Francis from Lifepoint Hospital System.

(IV)     <u>THSPP</u>

23.     THSPP is a not-for-profit corporation duly incorporated under the laws of the State of West Virginia.  THS is the sole corporate member of THSPP.  THSPP employs physicians providing primary and specialty care to those served by the Hospitals.  In total, THSPP employs approximately 125 people, including physicians and support staff.  While its corporate office is the same as Thomas Memorial, its service locations spread throughout the Kanawha Valley.

(V)     <u>Non-Debtor TMH Services, Inc.</u>

24.     TMH Services is primarily a real estate holding company, with interests in certain real property used by THS and the Hospitals.  TMH Services employees approximately 5 people.  TMH Services' real estate allow THS to expand services and support of the Hospitals.  TMH Services likewise provides real estate management services.  TMH Services is not a member of the Obligated Group (defined below).

(VI)     <u>Non-Debtor Foundation</u>

25.     The Foundation for Thomas Memorial and Saint Francis Hospitals, Inc. f/k/a The Thomas Memorial Hospital Foundation (the "<u>Foundation</u>"), is a nonprofit corporation formed in 1989.  The Foundation solicits, raises, holds, invests and distributes charitable contributions, gifts, bequests and devises for the purpose of providing support to the Hospitals. The Foundation ensures

that all donations are stewarded directly toward the greatest needs of the Hospitals and the patients and communities the Debtors and the Foundation serve.  The Foundation is part of the Obligated Group.

26.     An organizational chart of the Debtors, TMH Services and the Foundation follows:



b.     **General Financial Information**

27.     As of September 30, 2019, the Debtors' books and records showed approximately $229,211,000 in assets, including $133,279,000 in property and equipment.  The Debtors' total liabilities were approximately $240,703,000.

28.     For the twelve months ending September 30, 2019 ("FY 2019"), the Debtors recorded total revenues of approximately $267,415,000, an increase of approximately $263,837,000 from fiscal year 2018 ("FY 2018") and $266,725,000 from fiscal year 2017 ("FY 2017").  The Debtor's operating expenses (excluding depreciation, amortization and interest expenses) for FY 2019 were $253,278,000, an increase of approximately $250,399,000 from FY 2018 and $255,790,000 from FY 2017.

29.     For the 12 months ended September 30, 2019, the Debtors' reported a net loss of approximately $6,588,425.

## Part II:  Existing Indebtedness

### a.     The Secured Bonds

30.     Pursuant to a Master Trust Indenture dated as of June 1, 2008, between Thomas Memorial, Saint Francis and the Foundation (collectively, the "Obligated Group"), and United Bank, Inc. as Master Trustee, as supplemented and amended by a Supplemental Master Trust Indenture 2008-1, dated June 1, 2008, a Supplemental Master Indenture 2009-1, dated February 1, 2009, a Supplemental Master Trust Indenture 2009-2, dated July 1, 2009  (as amended and/or supplemented from time to time, the "Master Trust Indenture"), and that certain Bond Trust Indenture dated as of June 1, 2008 (the "Bond Trust Indenture"), the West Virginia Hospital Finance Authority (the "WVHFA") issued $148,920,000 in Bonds.

31.     Pursuant to the Master Trust Indenture, the members of the Obligated Group executed and delivered to the Master Trustee concurrently with the issuance of the Bonds, the Series 2008-1A Note, the Series 2008-1B Note and the Series 2008-1C Note (collectively the "Notes") all issued pursuant to Supplemental Master Trust Indenture.

32.     Pursuant to the Supplemental Master Trust Indenture 2009-2, dated February 1, 2009, THS became a party to the Master Indenture and a member of the Obligated Group after it received a determination letter from the Internal Revenue Service that it was a qualified 501(c)(3) not-for-profit organization.

33.     The proceeds of the Bonds were loaned to the Debtors pursuant to a Loan Agreement dated as of June 1, 2008, between the WVHFA and the Hospitals.  The Debtors used the proceeds of the Bonds to: (i) refinance $45 million of outstanding short term debt that was used to finance the acquisition of Saint Francis, (ii) construct a new six story pavilion on the South

Charleston campus (the "<u>Hospital Pavilion</u>") for approximately $70,000,000, and (iii) provide $10 million for capital expenditures for fiscal year 2009.  At the time of issuance, the Debtors were expected to generate over $37,000,000 of EBITDA in 2013 and have cash and investments of over $110 million.

34.    The Bonds allowed Thomas Memorial to: (i) increase its licensed bed capacity to 260 beds; (ii) increase all private rooms by 30% and offer these rooms to all acute and obstetric patients; (iii) provide a 30% increase in operating rooms; and (iv) provide a 33% increase in procedure rooms.  The Bonds also allowed Saint Francis to convert to all private rooms, making it the only facility in the area with all private rooms for acute and obstetric patients.

35.    Pursuant to the Master Trust Indenture, the Bond Trust Indenture, the Credit Line Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing executed and delivered by Thomas Memorial, and the Credit Line Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing executed and delivered by both Thomas Memorial and Saint Francis (each a "<u>Grantor</u>"), the Master Trustee was granted a security interest in, substantially all of the Debtors' assets.

36.    On or about August 16, 2018, UMB Bank ("<u>UMB</u>") replaced United Bank, Inc. as the Master Trustee.

37.    As of the Petition Date, there was approximately $137,910,000 in principal amount outstanding on the Bonds.

**b.    <u>Capital Leases</u>**

38.    The Debtors have a variety of capital leases of varying terms with Stryker, Cisco Systems, Inc., GE Healthcare, Automatic Data Processing Inc., Alcon, and Bausch + Lomb

(collectively, the "Capital Leases").  The aggregate amount of debt owed on the Capital Leases as of the Petition Date is approximately $6,324,000.

###    c.    Pension Liability

39.    The Debtors are sponsors of the Retirement Plan for Employees of Thomas Memorial, which is a tax-qualified, defined benefit pension plan (the "Pension Plan") covered by Title IV of Employee Retirement Income Security Act of 1974 ("ERISA").

40.    The Pension Plan provides pension benefits to approximately 1,590 current and former employees and beneficiaries.

41.    As of January 1, 2012, the Pension Plan was amended such that there were no new participants in the Pension Plan after December 31, 2011.

42.    Due to the increasing costs of maintaining the Pension Plan, on September 5, 2015 the Debtors froze future benefit accruals.

43.    As of October 1, 2019, the Debtors estimate the underfunded obligations under the Pension Plan to be in excess of $45,000,000.

###    d.    Trade Debt

44.    The Debtors incur trade indebtedness in the ordinary course of business.  Primarily, the general unsecured debt relates to the purchase of goods and services for the Hospitals.

45.    As of the Petition Date, the Debtors estimate the claims of general unsecured trade creditors to be approximately $32,000,000.

### Part III:  Events Leading to the Chapter 11 Case

46.    The Debtors have faced significant financial headwinds since 2015.  A declining economic environment in West Virginia attributable in large part to the war on coal, reduced reimbursement rates for healthcare services, financially unfavorable payer mixes, reductions in the

population within the region in which the Debtors operate, patient outmigration to competing health system in other markets, as well as a host of other issues arising from changes in the healthcare laws over the past decade have negatively impacted the Debtors' operations. Those challenges, coupled with the burden of servicing an overwhelming amount of indebtedness, have impaired the Debtors' ability to meet important working capital and operational needs, maintain ordinary course business relationships, pursue strategic opportunities, recruit medical professionals, and otherwise reinvest in its operations and facilities in order to grow revenue to further their mission.

47.     Between fiscal year 2015 and FY 2018, the Hospitals have seen a decline of adjusted admissions, observations, and emergency room visits by approximately 12%, 26% and 45%, respectively.  In addition, over the last five years, the commercial insurers' share of payor mix has declined from approximately 28% to approximately 18%.

48.     The population of Charleston has been decreasing for a number of years. According to the United States Census Bureau, Charleston, West Virginia's population dropped by approximately 6.6% from April 1, 2010 to July 1, 2017. Greater population decline is expected because West Virginia has a larger than average share of elderly residents.  According to U.S. Census data, West Virginia was the fourth oldest state in 2016, with a median age of 42.2.

49.     Moreover, local and national economic factors have played a key role in the Debtors' financial challenges. According to West Virginia University's Economic Outlook Report of 2016, mining employment declined from approximately 16,000 jobs in 2015 to just under 12,000 in 2016 and since that report there has been additional coal producer bankruptcies and corresponding layoffs, including in the more recently filed bankruptcy cases of Murray Energy Corporation, Blackjewel L.L.C, and Blackhawk Mining LLC.

13

50.     Due to the Debtors' payer mix and heavy reliance on Medicare and Medicaid, healthcare reform that results in the reduction of reimbursement rates directly impact the Debtors. For instance, in the past few years changes in the law have resulted in lower Medicare reimbursements.  According to a study conducted by the Federation of American Hospitals and the American Hospital Association, it is estimated that the cumulative federal payment to hospitals from 2010 through 2028 will be reduced by approximately $218.2 billion. The Debtors have a disproportionately high number of low-income patients covered by Medicare; therefore, the reduction in reimbursement rates have negatively impacted the Debtors' revenue.

51.     Further, recent reports rated West Virginia's overall health as a state at 46th out of the 50 states, based largely on the facts that West Virginia has the highest number of opioid-related overdose deaths in the United States in 2017 and has the highest obesity rate in the country, leading to an increasing rate of diabetes. All of these factors contribute to increased healthcare costs to be borne by the Debtors suffering from substantial reductions in Medicare reimbursement.

52.     Faced with these challenges, the Debtors took affirmative measures to cut costs and enhance revenue starting in 2016.  The Debtors, in consultation with third party advisors, implemented approximately 85 cost-cutting initiatives, which have resulted in millions of dollars in cost savings.  The savings in 2018 and 2019 were approximately $9.6 million and $6.9 million, respectively.  The Debtors also began to develop revenue enhancement plans that included specific capital improvement initiatives that would not only benefit patients from a care perspective, but also have already yielded positive financial results and are projected to further increase revenues in the future. Thomas Health has expanded its physician practices, installed three new state of the art cardiac catheterization laboratories, installed a state of the art linear accelerator, implemented

a 340B pharmacy program (under the 340B Drug Pricing Program), expanded its endoscopy center at St. Francis, and added the inpatient addiction healing center at St. Francis.

53.     Notwithstanding the Debtors' efforts to cut costs and enhance revenues, the combination of the aforementioned macro issues and the significant debt burden resulted in the Debtors defaulting on their Bond obligations and the realization that the long-term viability of the Hospitals, and the preservation of the jobs of more than 1,800 people they employ, required a more sustainable debt load.

**c.      Prepetition Restructuring Efforts**

54.     In addition to the aforementioned cost-cutting and revenue enhancement initiatives, the Debtors, in consultation with the Master Trustee and its professionals, commenced a pre-Chapter 11 process to explore strategic alternatives, including sale and refinancing opportunities, in February of 2019.

55.     On February 22, 2019, the Debtors retained SOLIC Capital Advisors ("SOLIC") to assist them in a search for both strategic buyers and financing alternatives.

56.     SOLIC conducted pre-marketing diligence, developed solicitation materials and prospective bidder/financing target lists, and established an electronic data room for interested parties to conduct due diligence.

57.     In April 2019, solicitation materials and target lists were shared with the Debtors, the Master Trustee and its professionals.  Both the solicitation materials and the target lists were approved by the Master Trustee and its professionals.  On April 15, 2019, SOLIC transmitted a teaser to 111 parties: 45 strategic parties and 66 financial parties identified on the target list.

58.     From those parties contacted, 34 executed confidentiality agreements as a prerequisite to receive a confidential information memorandum ("CIM").

59.     On May 24, 2019, a number of parties submitted preliminary written indications of interest to SOLIC and the Debtors – some strategic parties expressed an interest in a potential acquisition and some financial institutions expressed an interest in a potential financing alternative.

60.     From June 2019 through December 2019, interested parties conducted due diligence, which included, among other things, review of the Debtors' books and records, multiple management meetings, facility tours and onsite visits.  During this period, one financing party elected to withdraw from the process and another financing party joined.

61.     The Debtors, with the assistance of their advisors and in consultation with the Master Trustee and its professionals, analyzed and vetted the various alternatives, which included, among other things, the negotiation of definitive transaction terms and preparation of related documentation.  That process continued into the latter part of December 2019.

62.     As the terms of certain proposals contain covenants that require prompt action, coupled with the other facts and circumstances referenced herein, the Debtors filed these Chapter 11 Cases to preserve and potentially avail themselves of opportunities that will not only serve the best interests of all parties in interest but also likewise serve their mission and commitment to their employees, patients and the surrounding communities.

## Part IV:  First Day Motions

63.     Concurrently with the filing of the chapter 11 petitions, the Debtors filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to transition into these Chapter 11 Cases, preserve enterprise value and advance a course that serves both the interests of creditors and parties in interest as well as their mission.  The Debtors request that each of the First Day Motions be granted, as each constitutes a critical element in achieving a successful transition to chapter 11.

64.     For a more detailed description of the relief requested in the First Day Motions, the Debtors respectfully refer the Court, creditors and other parties in interest to the respective First Day Motion. To the extent that there are any inconsistencies between this Declaration and the First Day Motions, the First Day Motions should control. Capitalized terms that are used in this Part IV but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

**a.     Administrative Motions**

    i.     *Debtors' Motion for an Order Directing Joint Administration of Their Related Chapter 11 Cases (the "Joint Administration Motion")*

65.     The Debtors seek entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of West Virginia (the "Local Bankruptcy Rules"). Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 Cases under the lead case, Thomas Health Systems, Inc. Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 Cases of the Debtors to indicate the joint administration of the estates.

66.     Given the provisions of the Bankruptcy Code and the Debtors' affiliation, joint administration of these Chapter 11 Cases is warranted. Joint administration will avoid the preparation, replication, service and filing, as applicable, of duplicative notices, applications and orders, thereby saving the Debtors considerable expense and resources.

67.     The Debtors' financial affairs and business operations are closely related. Many of the motions, hearings and orders in these Chapter 11 Cases will affect each Debtor and their

respective estates. The rights of creditors will not be adversely affected, as this Motion requests only administrative, and not substantive, consolidation of the estates.

68.     Moreover, each creditor can still file its claim against a particular estate. In fact, all creditors will benefit by the reduced costs that will result from the joint administration of these Chapter 11 Cases. The Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files.

69.     Finally, supervision of the administrative aspects of these Chapter 11 Cases by the Office of the United States Trustee for the Southern District of West Virginia will be simplified.

70.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted.

> ii.     *Debtors' Application to Employ and Retain Omni Management Group as Notice, Claims and Solicitation Agent (the "Claims Agent Retention Application")*

71.     The Debtors seek the entry of an order employing and retaining Omni Management Group ("Omni") to act as the claims and noticing agent in order to assume full responsibility for, among other things, the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' Chapter 11 Cases.

72.     I have reviewed the rates and proposals from other claims and noticing agents and believe that Omni's rates are competitive and reasonable given Omni's quality of services and expertise.

73.     In view of the number of anticipated claimants and the complexity of the Debtors' businesses, I submit that the appointment of a claims and noticing agent will provide the most

effective and efficient means of, and relieve the Debtors and/or the Office of the Clerk of the Bankruptcy Court of the administrative burden of, noticing, administering claims, and soliciting and balloting votes, and is in the best interests of both the Debtors' estates and their creditors. Accordingly, on behalf of the Debtors, I respectfully submit that the Claims Agent Retention Application should be granted.

> iii.    *Debtors' Motion for Entry of an Order: (I) Authorizing Debtors to File a Consolidated Creditor Matrix; (II) Authorizing Debtors to File a Consolidated List of Debtors' 30 Largest Unsecured Creditors; (III) Authorizing Certain Procedures to Maintain the Confidentiality of Patient Information as Required by Privacy Rules; (IV) Establishing Patient Notice Procedures; and (V) Approving the Form and Manner of the Notice of Commencement of Chapter 11 Cases (the "Consolidation and Procedures Motion")*

74.    The Debtors seek entry of an order authorizing the Debtors to: (i) file a consolidated creditor matrix; (ii) file a consolidated list of the Debtors' 30 largest unsecured creditors; (iii) implement certain procedures to maintain the confidentiality of patient information and establishing patient notice procedures; and (iv) approving the form and manner of notice of commencement of these Chapter 11 Cases.

75.    I understand that the Debtors have hundreds, if not thousands, of creditors and parties in interest (on a consolidated basis) that may be entitled to receive notice of the Debtors' Chapter 11 Cases.  I believe that the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, administratively burdensome, and of little incremental benefit. This is especially true where, as here, the Debtors, working together with Omni before the Petition Date, have already prepared a single, consolidated list of the Debtors' creditors in electronic format.  The filing of a single consolidated matrix would also facilitate the United States Trustee's review of creditors' claims and the appointment of a single creditors' committee in these cases.

76.     The Debtors also seek the authority to file a single consolidated list of their 30 largest general unsecured creditors.  A consolidated list of 30 largest general unsecured creditors, together with a consolidated creditor matrix, will help alleviate administrative burdens, costs, and the possibility of duplicative services.

77.     With respect to the proposed noticing procedures, the Debtors seek the authority to implement certain noticing procedures, all as more fully set forth in the Consolidation and Procedures Motion.   These procedures balance the paramount interests of safeguarding confidential patient information with the disclosure requirements set forth in the Bankruptcy Code relating to creditors and parties in interest.  I believe the proposed procedures adequately balances the interest of transparency and disclosure with the requirement to protect confidential patient information

78.     Finally, in light of the impracticality of providing individual notice to each of the Debtors' thousands of current and former patients, the Debtors propose to serve the Commencement Notice, via regular mail, on all Patient Claimants, and by publication as soon as practicable following the entry of an order granting this Motion.  This will not only avoid confusion among creditors, but will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous creditor matrix.

79.     Accordingly, on behalf of the Debtors, I believe that it is in the best interests of the Debtors' estates and all creditors and other interested parties to adopt the foregoing procedures respectfully submit that the Consolidation and Procedures Motion should be granted.

   **b.     Operational Motions Requesting Immediate Relief**

        i.     *Debtors' Motion for Entry of Interim and Final Orders: (A) Authorizing the Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits; (B) Confirming that the*

> *Debtors May Continue Prepetition Employee Programs and Pay Employees in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor all Related Checks and Electronic Payment Requests (the "Wages and Benefits Motion")*

80.     The Debtors seek authority to pay and honor, in the ordinary course of business and in their sole discretion, prepetition claims and obligations related to: (a) Unpaid Compensation, (b) Uncashed Checks, (c) Deductions and Payroll Taxes, (d) Reimbursable Expenses, and (e) the Employee Benefit Programs, all as defined and described in the Wages and Benefits Motion, including authority to retain their current Executives and continue to compensate them on the ordinary course of business.

81.     If the requested relief is not granted, the Debtors' relationships with their employees would be adversely impacted and there could well be irreparable harm to the employees' morale, dedication, confidence and cooperation.

82.     The Debtors' business hinges on their relationships with their employees and, in turn, the relationship with the Debtors' clients. The employees' support for the Debtors' restructuring efforts is critical to the success of these Chapter 11 Cases.

83.     At this early stage, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably attend any decline in their employees' morale attributable to the Debtors' failure to pay wages and commissions, salaries, benefits and other similar items.

84.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be granted.

ii.     *Debtors' Motion for Entry of Interim and Final Orders Authorizing (I) Debtors to Pay Certain Prepetition Taxes and Fees and (II) Financial*

*Institutions to Honor and Process Related Checks and Transfers (the
"Taxes and Fees Motion")*

85.     The Debtors seek entry of an order (i) (a) authorizing, but not requiring, the
Debtors, in their sole discretion, to pay the Taxes and (b) authorizing the Banks to receive, process,
honor and pay checks or wire transfers used by the Debtors to pay such Taxes.

86.     In connection with the normal operations of their businesses, the Debtors collect,
withhold and incur the Taxes described in the Taxes and Fees Motion and remit those Taxes to
various Governmental Authorities.  The Debtors remit the Taxes through checks and electronic
transfers that the Banks process.

87.     For a variety of reasons (all as more fully set forth in the Taxes and Fees Motion),
the Debtors believe that, in an exercise of their sound business judgment, requesting the authority
to pay the Taxes and Other Taxes and Fees is necessary to permit a value-maximizing outcome in
these Chapter 11 Cases.  As discussed in the Taxes and Fees Motion, the Debtors must continue
to pay Taxes to continue operating and to avoid costly distractions during these Chapter 11 Cases.

88.     I believe that the relief requested in the Taxes and Fees Motion is in the best
interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a
critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on
behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be granted.

       iii.     *Debtors' Motion for Entry of Interim and Final Orders: (I) Authorizing
Debtors to Maintain Existing Bank Accounts and Business Forms and
Continue to Use Existing Cash Management System; (II) Granting
Administrative Expense Status for Intercompany Claims; and (III)
Waiving the Requirements of Section 345(b) of the Bankruptcy Code
(the "Cash Management Motion")*

89.     The Debtors seek entry of an order authorizing the Debtors to (a) maintain the
existing Bank Accounts and business forms and continue to use their existing Cash Management

System, (b) granting administrative priority to intercompany claims and (c) waiving the requirements of section 345(b) of the Bankruptcy Code.

90.    The Cash Management System maintained by the Debtors has been designed to: (i) provide an efficient method of collecting, transferring and disbursing funds; (ii) establish procedures and controls necessary to account for funds in an accurate manner; and (iii) facilitate meeting the Debtors' financial obligations.  The Debtors' Cash Management System includes the necessary accounting controls to enable the Debtors, as well as other interested parties in these cases, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.

91.    Without the requested relief, including approval of the intercompany transactions and authority to use existing business forms, all as more fully described in the Cash Management Motion, the Debtors may suffer undue disruptions to the Debtors' business operations and jeopardize the success of these Chapter 11 Cases.

92.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

    iv.    *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to: (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto; (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; (III) Honor the Terms of the Premium Financing Agreements and Pay Premiums Thereunder; and (IV) Enter Into New Premium Financing Agreements in the Ordinary Course of Business (the "Insurance Motion")*

93.    The Debtors seek entry of an order authorizing the Debtors to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto; (ii) renew,

amend, supplement, extend, or purchase Insurance Policies; (iii) honor the terms of the Premium Financing Agreements and pay premiums thereunder; and (iv) enter into new Premium Financing Agreements in the ordinary course of business.

94.     The Insurance Policies provide coverage for, among other things, the Debtors' property, general liability, medical professional liability, automobile liability, excess umbrella liability, directors' and officers' liability, network privacy and security liability, employer's liability and flood insurance.  The Debtors finance premiums for certain of their Insurance Policies because it is not economically advantageous for the Debtors to pay the premiums on the Financed Policies, in full, on a lump-sum, quarterly, or monthly basis.

95.     Continuation of the Debtors' Insurance Policies, and entry into new insurance policies, is essential to the preservation of the value of the Debtors' business and operations. Accordingly, to ensure uninterrupted coverage, the Debtors request authority to maintain their existing Insurance Policies, pay any prepetition obligations related thereto, honor their obligations under the Premium Financing Agreements, and enter into new Insurance Policies in the ordinary course of business.

96.     The Debtors believe that all material amounts related to the Insurance Policies that were due and payable on or prior to the Petition Date have been fully paid but, out of an abundance of caution and to avoid irreparable harm to their businesses, the Debtors seek authority to satisfy any such prepetition obligations through the Insurance Motion.

97.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be granted.

     *v.*     *Debtors' Motion for Entry of Interim and Final Orders: (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Service; (II) Deeming Utility Companies Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utilities Motion")*

98.    The Debtors seek entry of interim and final orders (i) determining that the Debtors' proposed offer of deposits, as set forth herein, provides Utility Companies with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (ii) approving procedures for resolving requests by Utility Companies for additional or different assurances beyond those set forth in this Motion, and (iii) prohibiting the Utility Companies from altering, refusing or discontinuing any utility services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance .

99.    Uninterrupted utility services are essential to the Debtors' ongoing operations. Should any utility company refuse or discontinue service, even for a brief period, the Debtors' operations could be severely disrupted. The impact of this disruption on the Debtors' day-to-day business operations and revenue would be extremely harmful and could jeopardize the value of the Debtors' assets.

100.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

Dated: January 10, 2020

_____
Daniel J. Lauffer
President and CEO of Thomas Health System, Inc.