## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| **In re:** | Chapter 11 |
| **THOMAS HEALTH SYSTEM, INC., et al.** | Case No. 20-20007 (FWV) |
| **Debtors[1]** | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR AMENDED
## JOINT CHAPTER 11 PLAN OF REORGANIZATION

Dated: August 3, 2020

**WHITEFORD TAYLOR & PRESTON LLP**

/s/ *Michael J. Roeschenthaler*
Michael J. Roeschenthaler (PA Id. No. 87647)
200 First Avenue, Third Floor
Pittsburgh, PA 15222
(412) 618-5601 Tel.
mroeschenthaler@wtplaw.com

Brandy M. Rapp (WV Bar No. 10200)
10 S. Jefferson Street, Suite 1110
Roanoke, Virginia 24011
(540) 759-3577 Tel.
brapp@wtplaw.com

*Counsel to the Debtors and
Debtors-in-Possession*

**FROST BROWN TODD, LLC**

Jared M. Tully (WV Bar No. 9444)
500 Virginia Street East, Suite 1100
Charleston, WV 25301
T: 304-345-0111
jtully@fbtlaw.com

Douglas L. Lutz (Ohio Bar No. 0064761)
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
T: 513-651-6800
dlutz@fbtlaw.com

*Local Counsel to the Debtors and
Debtors-in-Possession*

### THE DEBTORS' PLAN IS SUPPORTED BY BOTH:

**(I)  THE BOND TRUSTEE FOR THE SERIES 2008 BONDS, AND
(II) THE CREDITORS COMMITTEE.**

**THE DEBTORS, THE BOND TRUSTEE AND THE CREDITORS COMMITTEE
ENCOURAGE YOU TO *VOTE IN FAVOR OF THE PLAN*.**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are: Thomas Health System, Inc. (0674); Herbert J. Thomas Memorial Hospital Association (4900); Charleston Hospital, Inc. (2692); THS Physician Partners, Inc. (5947); and TMH Services, Inc. (6607).

## GLOSSARY

The following terms are used in the Disclosure Statement and the Plan. When used in this Disclosure Statement, these terms have the meanings ascribed to them in the glossary unless otherwise indicated. Please see the Plan (or, where indicated, certain other motions filed with the Bankruptcy Court) for the definitions of other capitalized terms used in the Disclosure Statement.

1.      *"2008 Bond Documents"* means, collectively, the indentures, notes and all other agreements, mortgages, security agreements, documents or instruments executed or delivered in connection with the Series 2008 Bonds, including but not limited to the Bond Indenture and the Master Indenture.

2.      *"2020 Bond Documents"* means, collectively, the indentures, notes and all other agreements, mortgages, security agreements, documents or instruments executed or delivered in connection with the issuance of the Series 2020 Bonds and on terms consistent with those set forth in the Plan.

3.      *"Administrative Claim Bar Date"* means the last date established by the Bankruptcy Court for a Holder of an Administrative Claim to file a request with the Bankruptcy Court for payment of such Administrative Claim in the manner indicated in Article II of the Plan.

4.      *"Administrative Claim"* means a Claim that has been timely filed before the Administrative Claim Bar Date (except as otherwise provided in the Plan or by a separate order of the Bankruptcy Court), for costs and expenses of administration under §§ 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries and payments for goods and other services); and (b) all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930, but excluding Professional Fee Claims.

5.      *"Affiliate"* has the meaning set forth in section 101(2) of the Bankruptcy Code.

6.      *"Allowed"* means, with respect to any Claim: (a) a Claim that has been scheduled by the Debtors in their Schedules as other than disputed, contingent or unliquidated, unless a Proof of Claim has been timely filed, and as to which the Debtors or other parties-in-interest have not filed an objection by the Claims Objection Deadline; (b) a Claim that has been allowed by a Final Order; (c) a Claim that is allowed: (i) in any stipulation executed prior to the Effective Date and approved by the Bankruptcy Court; or (ii) in any stipulation with the Reorganized Debtors or the Creditors Committee executed on or after the Effective Date pursuant to the terms set forth in Article VII.A.2 herein; (d) a Claim that is Allowed pursuant to the terms of the Plan; or (e) a Claim as to which a Proof of Claim has been timely filed and as to which no objection has been filed by the Claims Objection Deadline.

7.      *"Assumed Contract"* means any Executory Contract or Unexpired Lease assumed by the Reorganized Debtors in accordance with Article V of the Plan.

8.      *"Assumed Indemnification Provisions"* has the meaning ascribed to such term in Article V.E of the Plan.

9.      *"Assumption Notice"* has the meaning ascribed to such term in Article V.B of the Plan.

10.      *"Avoidance Actions"* means any and all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the Debtors, the Reorganized Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies under §§ 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code.

11.      *"Bankruptcy Code"* means title 11 of the United States Code, 11 U.S.C. § 101, et seq., as amended from time to time.

12.      *"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of West Virginia, having jurisdiction over the Chapter 11 Cases.

13.      *"Bankruptcy Exit Cash Requirement"* has the meaning ascribed to such term in Article IV.C of the Plan.

14.      *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time.

15.      *"Bar Date"* means any deadline for filing proofs of Claim, including, without limitation, Claims arising prior to the Petition Date and Administrative Claims, as established by an order of the Bankruptcy Court or under the Plan.

16.      *"Bond Collateral"* means the real and personal property of the Obligated Debtors securing their obligations to the Bond Trustee and Bondholders under the 2008 Bond Documents.

17.      *"Bond Deficiency Claims"* means the unsecured portion of the Allowed Series 2008 Bond Claims in the Allowed amount of $86,677,349.

18.      *"Bondholders"* means the holders of the Series 2008 Bonds.

19.      *"Bond Indenture"* means the Bond Trust Indenture dated as of June 1, 2008, between West Virginia Hospital Finance Authority and United Bank, Inc. as bond trustee, and any amendments or supplements thereto.

20.      *"Bond Trustee"* means UMB Bank, N.A., as successor master trustee and indenture trustee to United Bank, Inc. under the Bond Indenture, Master Indenture and other 2008 Bond Documents, and any successor trustee in such capacity.

21.      *"Business Day"* means any day, other than a Saturday, Sunday, "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)) or a day on which banking institutions in the State of West Virginia are authorized or obligated by law, executive order or governmental decree to be closed.

22.      *"CARES Act"* means *the Coronavirus Aid, Relief, and Economic Security Act*, which was enacted on March 27, 2020 to provide economic relief to protect the American people from the public health and economic impacts of COVID-19, and any amendments or supplemental relief related thereto.

23.      *"CARES Funds"* means any and all economic or other relief available under the CARES Act and any related programs, including, without limitation, certain public health and social services emergency funds established pursuant to, and in connection with, the CARES Act, modifications to certain Medicare and Medicaid provisions, amendments to Title VII of the Public Health Services Act, and any expanded coverage and reimbursement for diagnostic testing relating to COVID-19.

24.      *"Cash"* means unrestricted cash and cash equivalents, marketable securities and other liquid investments, including board-designated funds.

25.      *"Causes of Action"* means any claim, cause of action, controversy, demand, agreement, right (including to legal or equitable remedies), action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action also includes: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims; (c) any Avoidance Action and claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and (f) the Retained Claims.

26.      *"Challenge Rights"* means all rights afforded the Creditors Committee to investigate and challenge the amount, validity, extent, enforceability, perfection, or priority of the Series 2008 Bond Claims and Bond Collateral as set forth in the Final Cash Collateral Order.

27.      *"Challenge Litigation"* means the adversary commenced by the Creditors Committee against the Bond Trustee in the Bankruptcy Court as adversary no. 2:20-ap-02007 and purporting to assert certain claims and causes of action based on the Challenge Rights.

28.      *"Chapter 11 Cases"* means the bankruptcy cases commenced when the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on the Petition Date, which are being jointly administered under case number 20-20007 (FWV) in the Bankruptcy Court.

29.      *"Claim"* means a claim, as defined by Bankruptcy Code section 101(5), against any of the Debtors, whether or not asserted or Allowed.

30.      *"Claim Estimation Amount"* means for purposes of voting on the Plan, either (i) the Claim amount temporarily allowed by Order of the Bankruptcy Court for voting purposes pursuant to Bankruptcy Rule 3018, (ii) the Claim amount contained on any Proof of Claim that has been timely filed with the Bankruptcy Court or Omni Agent Solutions, the claims agent appointed in this case (or otherwise deemed timely filed by the Bankruptcy Court under applicable law) to which no objection has been asserted, (iii) the unsecured Claim amount listed in the Schedules, even if such Claim is marked as disputed, contingent, and unliquidated, provided that such Claim has not been superseded by a filed Claim that is not subject to an objection, or (iv) in the absence of any of the foregoing, the Claim will be assigned a value of $0.00.

31.      *"Claims Objection Deadline"* means, with respect to any Claim, the latest of (a) one hundred eighty (180) days after the Effective Date; (b) ninety (90) days after the filing of an applicable Proof of Claim; or (c) such other date as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claim.

32.      *"Claims Register"* means the official claims register maintained in the Debtors' Chapter 11 Cases.

33.      *"Class"* means a class or category of Claims as classified and described in Article III of the Plan.

34.      *"CMS"* means the Centers for Medicare and Medicaid Services.

35.      *"Committee Professionals"* has the meaning ascribed to such term in Article IV.S of the Plan.

36.      *"Confirmation"* means the occurrence of the Confirmation Date.

37.      *"Confirmation Date"* means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the Bankruptcy Court's docket.

38.      *"Confirmation Hearing"* means the final hearing on confirmation of the Plan pursuant to Bankruptcy Code section 1129.

39.      *"Confirmation Order"* means the order entered by the Bankruptcy Court confirming the Plan in accordance with Chapter 11 of the Bankruptcy Code.

40.      *"Consummation"* means the occurrence of the Effective Date.

41.      *"Convenience Claim"* means a Claim that would otherwise be classified as a General Unsecured Claim that is (i) in the amount of $1,000 or less or (ii) in an amount greater than $1,000 if the Holder of such Claim elects, on such Holder's timely cast ballot for voting on the Plan, to (x) reduce its Claim to the amount of $1,000 and (y) accept the distribution set forth

in Article III.D of the Plan in full satisfaction, settlement and release, and discharge of such Claim, as such Class is authorized pursuant to the provisions of Bankruptcy Code section 1122.

42.     *"Convenience Class Cap"* has the meaning ascribed to such term in Article III.D.4 of the Plan.

43.     *"Corporate Governance Documents"* means the certificates of incorporation, certificates of formation, limited liability agreements and by-laws of the Debtors and the Reorganized Debtors.

44.     *"COVID-19"* means the disease formerly referred to as the "2019 novel coronavirus," "2019-nCoV," and/or often referred to as just "Coronavirus," with 'CO' standing for 'corona,' 'VI' for 'virus,' 'D' for disease, and '19' for 2019.

45.     *"COVID-19 Restrictions"* means any local, state or federal guidance, rules, regulations, direction, or law related to COVID-19 (or a similar/related strain) that would hinder or bar action by the Debtors, Reorganized Debtors, or third parties who are necessary to effectuate the Plan.

46.     *"Creditor"* means a holder of a Claim against a Debtor or Debtors.

47.     *"Creditors Committee"* means the Official Committee of Unsecured Creditors formed in these Chapter 11 Cases by the Office of the United States Trustee on January 29, 2020.

48.     *"Cure"* means the payment of Cash by the Reorganized Debtors, or the distribution of other property (each, as the parties may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtors and (b) permit the Reorganized Debtors to assume such Executory Contract or Unexpired Lease under Bankruptcy Code section 365(a).

49.     *"Cure Claim Amount"* has the meaning ascribed to such term in Article V.B of the Plan.

50.     *"D&O Liability Insurance Policies"* means all Insurance Policies (including, without limitation, any management liability policies, general liability policies, any errors and omissions policies, and, in each case, any agreements, documents, or instruments related thereto) issued at any time on or prior to the Effective Date and providing coverage for liability of any Debtors' directors, managers, and officers, and including any "tail", "runoff" or extended reporting period coverage to the extent obtained by the Debtors in relation to any such Insurance Policies.

51.     *"Debtor Intercompany Claim"* means any Claim held by a Debtor against another Debtor, all of which shall be Reinstated in the Plan.

52.     *"Debtor Released Claims"* has the meaning ascribed to such term in Article VIII.C of the Plan.

53.     *"Debtor Released Parties"* means (i) any Debtor Representatives, (ii) the Creditors Committee, (iii) the Bond Trustee and Bondholders, and (iv) the respective current members, officers, directors, agents, subsidiaries, affiliates, general and limited partners, financial advisors, investment bankers, restructuring consultants, independent accountants, attorneys, employees and representatives of the foregoing persons, acting in such capacities, in any way relating to the Debtors and the Chapter 11 Cases.

54.     *"Debtors"* means Thomas Health System, Inc., Herbert J. Thomas Memorial Hospital Association, Charleston Hospital, Inc., THS Physician Partners, Inc., and TMH Services, Inc.

55.     *"Debt Service Reserve Fund"* means the debt service reserve fund previously deposited with the Bond Trustee pursuant to the Bond Indenture for the purpose of securing the Obligated Debtors' payment obligations under the 2008 Bond Documents.

56.     *"Diminution Claim"* means the Claims of the Bond Trustee for diminution in value from and after the Petition Date of the Bond Trustee's interest in any Bond Collateral resulting from the Debtors' postpetition use of Bond Collateral or the imposition of the automatic stay.

57.     *"Disallowed Claim"* means any Claim or portion thereof, which has been disallowed by a Final Order and includes any Claim that is not an Allowed Claim for any other reason.

58.     *"Disbursing Agent"* means the Debtors or the Reorganized Debtors, or the entity or entities chosen by the Debtors or the Reorganized Debtors to make or facilitate distributions pursuant to the Plan.

59.     *"Disclosure Statement"* means the Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization, dated August 3, 2020, as the same may be altered, modified, or amended.

60.     *"Disputed"* means, with respect to any Claim, any Claim that is not yet Allowed and is subject to a claims objection filed before the Claims Objection Deadline.

61.     *"Distribution Date"* means, except as otherwise provided in the Plan (including the terms provided in the Plan for distributions on account of Series 2008 Bond Claims), the date, occurring as soon as practicable after the Effective Date, but occurring no later than thirty (30) days after the Effective Date, on which the Disbursing Agent first makes permissible distributions to Holders of Allowed Claims as provided in the Plan and any date thereafter on which the Disbursing Agent makes distributions to Holders of Allowed Claims as provided in the Plan.

62.     *"Distribution Record Date"* means the Effective Date or such other date as may be designated in the Confirmation Order. For the avoidance of doubt, the Bond Trustee may set record dates under the 2008 Bond Documents for funds received by the Bond Trustee under the Plan for distribution to Bondholders.

63.      *"DSCR"* has the meaning ascribed to such term in Article IV.C.6 of the Plan.

64.      *"Effective Date"* means, unless the Confirmation Order directs otherwise, a Business Day selected by the Debtors, which is no later than five (5) Business Days after the date on which each of the conditions to the Plan's Effective Date set forth in the Plan have either been satisfied or waived in accordance with the Plan.

65.      *"Entity"* has the meaning set forth in section 101(15) of the Bankruptcy Code.

66.      *"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended from time to time.

67.      *"Estate"* means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

68.      *"Executory Contract"* means a contract to which any of the Debtors is a party that is capable of assumption or rejection under Bankruptcy Code section 365.

69.      *"Exculpated Claim"* means any claim related to any act or omission in connection with, relating to or arising out of the Debtors' in or out-of-court restructuring efforts (including any and all actions associated with exploration and solicitation of financing/refinancing opportunities, sales or similar transactions, restructurings, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement or the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the administration and implementation of the Plan, the issuance of the Series 2020 Notes and the execution of 2020 Bond Documents, or the distribution of property under the Plan or any other related agreement; provided, however, that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud to the extent imposed by applicable non-bankruptcy law. For the avoidance of doubt, no Cause of Action, obligation or liability expressly established or preserved by the Plan or the Plan Supplement constitutes an Exculpated Claim.

70.      *"Exculpated Parties"* means, collectively, and in each case in their capacities as such prior to and during the Chapter 11 Cases: (a) each of the Debtors and their Representatives; (b) each of the Reorganized Debtors and their Representatives; (c) the Creditors Committee and its members and its Representatives; (d) the Bond Trustee and Bondholders; (e) any other Person designated as an Exculpated Party by operation of the Plan; and (f) with respect to each of the foregoing in clauses (a) through (e), such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, members of a board of trustees, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

71.      *"Final Cash Collateral Order"* means the Final Order of the Bankruptcy Court entered on March 30, 2020, wherein the Bankruptcy Court authorized the Debtors' continued use of cash collateral subject to certain conditions contained therein.

72.     *"**Final Order**"* means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, is not subject to any pending stay and as to which the time to reasonable appeal, move for reargument, reconsideration, or rehearing, or seek certiorari has expired and no appeal, motion for reargument, reconsideration, or rehearing or petition for certiorari has been timely taken or filed, or as to which any appeal that has been taken, motion for reargument, reconsideration, or rehearing that has been granted or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

73.     *"**Foundation**"* means The Foundation for the Thomas Memorial and Saint Francis Hospitals, Inc.

74.     *"**General Unsecured Claim**"* means any Claim that is not a Secured Claim and is not an Administrative Claim, a Professional Fee Claim, a Priority Tax Claim, an Other Priority Claim, a Convenience Claim (except for purposes of defining Convenience Claims), or a Debtor Intercompany Claim. For the avoidance of doubt, Trade Claims and Bond Deficiency Claims shall be an Allowed General Unsecured Claim.

75.     *"**Global 9019 Settlement**"* has the meaning ascribed to such term in Article IV.A of the Plan.

76.     *"**Governmental Unit**"* has the meaning set forth in section 101(27) of the Bankruptcy Code.

77.     *"**GUC Claims Resolution Process**"* has the meaning ascribed to such term in Article IV.S of the Plan.

78.     *"**GUC Distribution**"* means the payment by the Debtors of Cash, free and clear of any Liens, claims or encumbrances, in the amount of $7,000,001, exclusively for the distribution to Holders of Allowed Class 5 General Unsecured Claims pursuant to the terms set forth in Article III.D.5 herein. For the avoidance of doubt, as part of the Global 9019 Settlement, the Bond Trustee shall receive $1.00 on account of all Allowed Bond Deficiency Claims in full and final settlement of all such Allowed Bond Deficiency Claims, with the remaining $7,000,000 of the GUC Distribution available exclusively for distribution to the Holders of Non-Deficiency General Unsecured Claims.

79.     *"**Holder**"* means an Entity holding a Claim.

80.     *"**Hospitals**"* means Thomas Memorial and St. Francis.

81.     *"**Impaired**"* means, with respect to any Claim, such Claim is impaired within the meaning of section 1124 of the Bankruptcy Code.

82.    *"Indemnification Provisions"* means each of the Debtors' indemnification provisions in place immediately prior to the Effective Date whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, the 2008 Bond Documents, or contracts for the current and former directors, officers, managers, employees, attorneys, other professionals, and agents and such current and former directors, officers, and managers' respective Affiliates.

83.    *"Indenture Funds"* means all funds held by the Bond Trustee, including funds swept from the Debt Service Reserve Fund described in the 2008 Bond Documents, in the Bond Trustee's possession as of the Petition Date in the amount of $5,390,180.

84.    *"Insurance Policies"* means, collectively, all of the Debtors' insurance policies and any agreements, documents, or instruments related thereto.

85.    *"Insurer"* has the meaning ascribed to such term in Article VI.I of the Plan.

86.    *"Issuer"* means West Virginia Hospital Finance Authority, a body politic and corporate of the State of West Virginia.

87.    *"Lien"* means any lien, security interest, pledge, title retention agreement, encumbrance, leasehold, charge, mortgage, or hypothecation to secure payment of a debt or performance of an obligation, other than, in the case of securities and any other equity ownership interests, any restrictions imposed by applicable United States or foreign securities laws.

88.    *"Loan Agreement"* means the loan agreement to be entered into between the Issuer and the Obligated Debtors with respect to the proceeds of the Series 2020 Bonds.

89.    *"Master Indenture"* means the Master Trust Indenture dated as of June 1, 2008, between Thomas Memorial Hospital Association and Charleston Hospital, Inc. and the non-debtor Thomas Memorial Hospital Foundation, and United Bank, Inc. as Trustee, as supplemented and amended by a Supplemental Master Trust Indenture 2008-1, dated June 1, 2008, a Supplemental Master Indenture 2009-1, dated February 1, 2009, a Supplemental Master Trust Indenture 2009-2, dated July 1, 2009, as amended and/or supplemented from time to time.

90.    *"Medicare and Medicaid Assumption Date"* has the meaning ascribed to such term in Article V.D of the Plan.

91.    *"Medicare and/or Medicaid Provider and Supplier Agreements"* means the Medicare and or Medicaid Participating Physician or Supplier Agreements and Provider Agreements entered into between CMS and any of the Debtors.

92.    *"Non-Deficiency General Unsecured Claims"* means any General Unsecured Claim that is not a Bond Deficiency Claim.

93.    *"Obligated Debtors"* means Thomas Health System, Inc., Herbert J. Thomas Memorial Hospital Association and Charleston Hospital, Inc.

94.    *"Operating Reserve Fund"* means the fund to be established pursuant to the terms of the 2020 Bond Documents and held by the bond trustee for the Series 2020 Bonds.

95.    *"Other Priority Claim"* means any Claim entitled to priority under Bankruptcy Code sections 507(a)(3), (4), (5), (7) or (9).

96.    *"Other Secured Claim"* means any Secured Claim other than that portion of the Series 2008 Bond Claims that are an Allowed Secured Claim under the Plan.

97.    *"Other Settlements"* means other settlements proposed by the Debtors in accordance with Bankruptcy Rule 9019 as memorialized in Article IV, Section U of the Plan or further disclosed in the Plan Supplement.

98.    *"PBGC"* means the Pension Benefit Guaranty Corporation, a federal agency that administers the pension insurance program under Title IV of ERISA.

99.    *"Person"* has the meaning set forth in section 101(41) of the Bankruptcy Code.

100.    *"Petition Date"* means January 10, 2020 with respect to Thomas Health System, Inc., Herbert J. Thomas Memorial Hospital Association, Charleston Hospital, Inc. and THS Physician Partners, Inc., and May 22, 2020 with respect to TMH Services, Inc.

101.    *"Plan"* means the Amended Joint Chapter 11 Plan of Reorganization dated August 3, 2020, as altered, modified, or amended in accordance with the Bankruptcy Code and the Bankruptcy Rules.

102.    *"Plan Supplement"* means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan filed by the Debtors as may be amended, supplemented, altered, or modified from time to time on the terms set forth in the Plan. For the avoidance of doubt, no Plan Supplement shall affect the terms of the Global 9019 Settlement or alter the claims objection process set forth in Article VII.A.2 of the Plan.

103.    *"Priority Tax Claim"* means any Claim of a Governmental Unit of a kind entitled to priority under Bankruptcy Code section 507(a)(8), if Allowed.

104.    *"Professional Fee Claim"* means a Claim for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Effective Date. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute a Professional Fee Claim.

105.    *"Professionals"* means all professionals employed in these Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328 or 1103.

106.    *"Proof of Claim"* means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

107.    *"Pro Rata Share"* means with reference to any distribution on account of any Allowed Claim in any Class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in that Class.

108.    *"Public Gatherings"* has the meaning ascribed to such term in Article IV.P of the Plan.

109.    *"Reinstated"* means, with respect to a Claim, that the Claim shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

110.    *"Released Claims"* has the meaning ascribed to such term in Article VIII.D of the Plan.

111.    *"Released Parties"* means, collectively, and in each case in their capacities as such prior to and during the Chapter 11 Cases: (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) the Foundation (solely with respect to claims of the Bond Trustee and/or the holders of Series 2008 Bond Claims); (d) the Bond Trustee and Bondholders; (e) the Creditors Committee and its members; and (f) with respect to each of the foregoing in clauses (a) through (e), such Entity's financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such. As applied to Bondholders, the Bond Trustee, and the Creditors Committee, Released Parties also means the Debtors' employees, officers, directors, and board members.

112.    *"Releasing Parties"* means all Persons or Entities who have held, hold or may hold Claims that have been or will be released or discharged pursuant to the Plan, provided, however, that only the Bond Trustee and/or the holders of Series 2008 Bond Claims shall be Releasing Parties with respect to the Foundation.

113.    *"Relief Funds"* means any funds, proceeds, or other forms of relief available (monetary or non-monetary) under the CARES Act, including, without limitation, the CARES Funds, in addition to any and all other funds/relief available from any local, state, or federal agency or Governmental Unit, from any insurer, or under any Insurance Policies.

114.    *"Reorganized Debtor"* means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.

115.    *"Representatives"* means any and all officers, directors, managers, principals, members, employees, agents, advisory board members, members of a board of trustees, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each solely in their respective capacities as such, serving or holding interests immediately prior to the occurrence of the Effective Date.

116.    *"Retained Claims"* means the Debtors' interests in all existing and potential causes of action and litigation in which any of the Debtors is the plaintiff (or could be a plaintiff), or a defendant with a counterclaim or cross claims, including, without limitation, any claim, right or interest each or any of the Debtors may have as a direct or indirect result of

COVID-19, against or with respect to any local, state, or federal government, agency, instrumentality, or other Governmental Unit as well as any insurer (or account of any Insurance Policy), including, without limitation, Relief Funds.

117. *"Rosemawr"* means Rosemawr Management, LLC on behalf of its investment funds as purchasers of the Series 2020 Bonds.

118. *"Rosemawr Term Sheet"* has the meaning ascribed to such term in Article IV.C.2 of the Plan.

119. *"Schedules"* means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statement of financial affairs filed by the Debtors pursuant to Bankruptcy Code section 521 and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

120. *"Secured Claim"* means any Claim of a Creditor that is secured by property of the Estates, to the extent of the value of the Creditor's interest in the Estates' interest in such property, as provided in Bankruptcy Code section 506(a), including the Other Secured Claims. Secured Claim also means a Claim of a Creditor that is subject to setoff under Bankruptcy Code section 553, to the extent of the amount subject to setoff, as provided in Bankruptcy Code section 506(a), and specifically including the secured portion of the Series 2008 Bond Claims and Other Secured Claims.

121. *"Segregated GUC Account"* means the segregated account established by the Debtors into which the Debtors shall deposit the GUC Distribution on or before the Effective Date.

122. *"Self Insured Trust"* means that certain trust created pursuant to the Self-Insurance Trust Agreement of Herbert J. Thomas Memorial Hospital executed on August 8, 1978 by and between Herbert J. Thomas Memorial Hospital Association and Kanawha Banking & Trust Company National Association, and any and all amendments thereto.

123. *"Series 2008 Bond Claims"* means the Claims against the Debtors under the 2008 Bond Documents and Claims against the Debtors relating to the 2008 Bond Documents under the Final Cash Collateral Order, including but not limited to the Diminution Claims, in the Allowed amount of $144,915,729.

124. *"Series 2008 Bond Payment"* means the payment by the Debtors to the Bond Trustee in the amount of $52,848,200 to be distributed on account of the Allowed Series 2008 Secured Bond Claims as set forth in Article III.D.1 of the Plan.

125. *"Series 2008 Bonds"* means those certain West Virginia Hospital Finance Authority Hospital Revenue Improvement Bonds (Thomas Health System, Inc.) Series 2008 issued as of June 30, 2008 pursuant to the Bond Indenture.

126.    *"Series 2008 Note"* means collectively, those certain $87,239,440 Series 2008-1A note(s) dated June 30, 2008, $50,521,335 Series 2008-1B note(s) dated June 30, 2008, $11,158,225 Series 2008-1C note(s) dated June 30, 2008, issued pursuant to the Master Indenture as security for the Series 2008 Bonds, and any subsequent note/debt instrument giving rise to the Series 2008 Bond Claims, prior to the Petition Date.

127.    *"Series 2008 Secured Bond Claims"* means the secured portion of the Allowed Series 2008 Bond Claims in the Allowed amount of $58,238,380.

128.    *"Series 2020 Bonds"* means the West Virginia Hospital Finance Authority Refunding Revenue Bonds (Thomas Health System, Inc.), Series 2020 A to be issued as a combination of tax-exempt and taxable non-rated fixed rate bonds by the Issuer, subject to its authority and discretion, in the aggregate principal amount of $60,100,000, to (i) refund and retire the Series 2008 Bonds at a discount to the current par amount outstanding, (ii) fund a debt service reserve fund for the Series 2020 Bonds, (iii) fund the Operating Reserve Fund, if necessary, as described in Article IV.C.1 of the Plan and (iv) finance costs of issuance of the Series 2020 Bonds.

129.    *"Series 2020 Notes"*" means that certain Series 2020A Note or Notes dated as of the closing date for Series 2020 Bonds issued by the Obligated Debtors to the Issuer as security for the Series 2020 Bonds.

130.    *"St. Francis"* means Debtor Charleston Hospital, Inc. d/b/a Saint Francis Hospital.

131.    *"Stay Claimants"* has the meaning ascribed to such term in Article VI.I.5 of the Plan.

132.    *"Thomas Health"* means Debtor Thomas Health System, Inc.

133.    *"Thomas Memorial"* means Debtor Herbert J. Thomas Memorial Hospital Association.

134.    *"THSPP"* means Debtor THS Physician Partners, Inc.

135.    *"TMH Pension Plan"* has the meaning ascribed to such term in Article IV.I of the Plan.

136.    *"TMH Services"* means Debtor TMH Services, Inc.

137.    *"Tort Claims"* means any direct or indirect Claim arising on or before the Petition Date, including, without limitation, personal injury claims for physical, mental, emotional, and economic injuries resulting from, related to or in connection with medical care provided by the Debtors (or to have been provided by the Debtors but not delivered) or any of its employees or associated physicians/nurses, whether or not a proof of claim with respect to any such claims were filed, including without limitation, claims for malpractice.

138.    *"Trade Claim"* means any Claim held by an ordinary course trade vendor of the Debtors against any of the Debtors on account of ordinary course goods and/or services provided to any of the Debtors. For the avoidance of doubt, Trade Claims are treated as General Unsecured Claims under the Plan.

139.    *"Unexpired Lease"* means a lease to which any of the Debtors is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

140.    *"Unimpaired"* means with respect to any Claim, a Claim that is not Impaired.

141.    *"U.S. Trustee Fees"* means all fees and charges assessed against the Estates under 28 U.S.C. § 1930 of the United States Code.

142.    *"Voting Deadline"* means the deadline for voting to accept or reject the Plan, as determined by the Bankruptcy Court.

## DISCLAIMER

THIS DISCLOSURE STATEMENT, THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED AUGUST 3, 2020, ATTACHED HERETO AS <u>EXHIBIT A</u> (THE "PLAN"), THE ACCOMPANYING BALLOTS AND RELATED MATERIALS DELIVERED HEREWITH, ARE BEING PROVIDED BY THE DEBTORS TO KNOWN HOLDERS OF CLAIMS PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE DEBTORS URGE YOU TO VOTE TO ACCEPT THE PLAN.

EACH HOLDER OF A CLAIM AGAINST THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND BANKRUPTCY CODE SECTION 1125. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTORS, THEIR PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE PLAN. NO SOLICITATIONS FOR OR AGAINST THE PLAN MAY BE MADE EXCEPT THROUGH THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. ALTHOUGH THE DEBTORS HAVE MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS

QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTORS AS TO HOLDERS OF CLAIMS AGAINST THE DEBTORS. NO PERSON OR ENTITY SHOULD RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS DISCLOSURE STATEMENT OR THE PLAN PRIOR TO THE CONFIRMATION OF THE PLAN BY THE BANKRUPTCY COURT.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED IN THE PLAN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR

OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

HOLDERS OF CLAIMS AND OTHER THIRD PARTIES SHOULD BE AWARE THAT THE PLAN CONTAINS INJUNCTIONS AND RELEASES THAT MAY MATERIALLY AFFECT THEIR RIGHTS.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTORS AND THEIR PROFESSIONALS. ALTHOUGH THE DEBTORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED IN THE PLAN AND IN THE EXHIBITS ATTACHED HERETO, THE DEBTORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER BUT RATHER AS THE DEBTORS' STATEMENT OF THE STATUS OF THE RESPECTIVE MATTER.

THE DEBTORS RECOMMEND THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN. IT IS THE OPINION OF THE DEBTORS THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTORS. ACCORDINGLY, THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. EASTERN TIME, AUGUST 11, 2020, UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA. YOUR VOTE ON THE PLAN IS IMPORTANT.

**THIS IS A SOLICITATION FOR VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF 1126 OF THE BANKRUPTCY CODE. THE**

**DEBTORS HAVE REQUESTED THAT THE BANKRUPTCY COURT APPROVE THIS DISCLOSURE AS CONTAINING INFORMATION OF A KIND AND IN SUFFICIENT AND ADEQUATE DETAIL TO ENABLE CLAIMHOLDERS TO MAKE AN INFORMED JUDGMENT WITH RESPECT TO ACCEPTANCE OR REJECTION OF THE PLAN. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT (WHEN SUCH APPROVAL IS OBTAINED) DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN, OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

## I.    INTRODUCTION

On January 10, 2020 (the "Petition Date"), Debtors Thomas Health System, Inc. ("Thomas Health"), Herbert J. Thomas Memorial Hospital Association ("Thomas Memorial"), Charleston Hospital, Inc. d/b/a/ St. Francis Hospital ("St. Francis", and together with Thomas Memorial, the "Hospitals") and THS Physician Partners, Inc. ("THSPP") filed voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code. The Chapter 11 Cases are jointly administered under bankruptcy case number 20-20007. On May 22, 2020, TMH Services, Inc. ("TMH Services") also filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. TMH Services' bankruptcy case is being jointly administered with the Chapter 11 Cases. Since the Petition Date, the Debtors have remained in possession of their assets and managed their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Plan is centered around a comprehensive settlement and compromise among the Debtors, the Bond Trustee and the Creditors Committee regarding the Debtors' obligations associated with their senior secured indebtedness, the Series 2008 Bond Claims, the Challenge Rights, and the Challenge Litigation, which enables the Plan to become effective in these Chapter 11 Cases, ends the incurrence and expenditure of continuing administrative expenses of the Debtors, permits cash payments to be made to certain creditors, including General Unsecured Creditors, on or about the Effective Date of the Plan and thereafter, and resolves the remaining litigation pending among the Creditors Committee, the Bond Trustee and all other parties named in the Challenge Litigation (hereinafter, the "Global 9019 Settlement"). The Global 9019 Settlement will therefore permit the Debtors to realize their multi-year effort to resolve their senior debt obligations and maintain their existing healthcare businesses. The Global 9010 Settlement provides for (i) the classification and treatment of the Series 2008 Bond Claims specified in the Plan; (ii) the release and exculpation terms for the Bond Trustee, Bondholders, the Creditors Committee and its members, as specified in the Plan, including, without limitation, the Releasing Parties releasing the Released Claims; (iii) the compromise of the Bond Trustee's Diminution Claims; (iv) the Bond Trustee's agreement to support the Debtors' use of Cash to pay Allowed Administrative Claims, Professional Fee Claims, Priority Tax Claims, and Other Priority Claims; (v) the compromise of the Bond Deficiency Claims; (vi) the Debtors' use of Cash to provide liquidity to the Debtors' continued business on and after the Effective Date; (vii) funding of the GUC Distribution to pay Allowed General Unsecured Claims under the Plan; (viii) the settlement and dismissal of the Challenge Litigation with prejudice as of the Effective Date and (ix) the agreement by the Bond Trustee, the majority holders of the Series 2008 Bond Claims and the Creditors Committee to support confirmation of the Plan. The treatment and

17

distributions provided for in the Plan with respect to the Class 1 and Class 5 Claims under the Global 9019 Settlement reflect a compromise and settlement of numerous complex issues including the scope, extent and value of the collateral associated with the Series 2008 Bonds, the valuation of the Bond Trustee's Diminution Claims, the extent and value of assets of the Estates available for distribution to Holders of Allowed General Unsecured Claims and other issues raised in the Challenge Litigation, potential disputes and objections the Bond Trustee, the Creditors Committee and Debtors would litigate concerning the Debtors' ability to confirm a contested plan, and related matters.

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes to accept or reject their Amended Joint Chapter 11 Plan of Reorganization dated August 3, 2020, a copy of which is attached hereto as <u>Exhibit A</u>. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. To the extent that the information provided in this Disclosure Statement and the Plan (including any Plan Supplements) conflict, the terms of the Plan (including any Plan Supplements) will control. Terms not otherwise specifically defined herein will have the meanings attributed to them in the Plan. Each definition in this Disclosure Statement and in the Plan includes both the singular and plural. Headings are for convenience of reference and shall not affect the meaning or interpretation of this Disclosure Statement.

At a joint hearing to be held on the adequacy of this Disclosure Statement and confirmation of the Plan, the Debtors will request that the Bankruptcy Court approve this Disclosure Statement as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code to enable a hypothetical, reasonable investor typical of claimholders in a Class of Claims entitled to vote as set forth in the Plan to make an informed judgment about whether to accept or reject the Plan. A hearing to consider the adequacy of this Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing") will be held on <u>August 15, 2020 at 10:00 a.m.</u>, before the Honorable Frank W. Volk, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of West Virginia, Robert C. Byrd U.S. Courthouse, 300 Virginia Street East, Room 3200, Charleston, West Virginia 25301. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements for confirmation under the Bankruptcy Code.

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan and approval of the Disclosure Statement must be filed and served so they are received on or before <u>August 4, 2020</u>, in the manner described in Article V.D.2 of this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The following documents are attached as Exhibits to this Disclosure Statement:

Exhibit A:    The Plan

Exhibit B:    Liquidation Analysis

Exhibit C:    Financial Projections

Voting instructions are contained in Article V.C of this Disclosure Statement, as well as on the Ballot you received in connection with this Disclosure Statement. To be counted, your original Ballot must be actually received at the address listed above by 5:00 p.m., Eastern Time, on August 11, 2020 (the "Voting Deadline").

If your Ballot is not timely received by the Voting Deadline, it may not be counted in determining whether the Plan has been accepted. You are urged to carefully review the contents of the Plan and Disclosure Statement, including all Exhibits attached thereto, before making your decision to vote to accept or reject the Plan. If your Claim is "Impaired" (as defined in Article V.C.3 of this Disclosure Statement), you are entitled to vote to accept or reject the Plan. Particular attention should be directed to the provisions of the Plan affecting or impairing your rights as they may presently exist, including, but not limited to, the provisions which provide for injunctions and releases.

This Disclosure Statement is intended to provide adequate information of a kind, and in sufficient detail, to enable the Creditors to make an informed judgment about the Plan, including whether to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding (i) the Debtors' prepetition operating and financial history; (ii) the Debtors' need to file for relief under chapter 11 of the Bankruptcy Code; (iii) significant events that have occurred during the Chapter 11 Cases; (iv) the terms of the Plan; (v) the manner in which distributions will be made under the Plan; (vi) certain effects of confirmation of the Plan; (vii) certain risk factors associated with the Plan; and (viii) the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

This Disclosure Statement is subject to the Bankruptcy Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan. **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

**CREDITOR SUPPORT. THE DEBTORS HAVE NEGOTIATED THE TERMS OF THE PLAN WITH, AND THE PLAN IS SUPPORTED BY THE DEBTORS' PRIMARY SECURED CREDITOR, THE INDENTURE TRUSTEE FOR THE SERIES 2008 BONDS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS.**

## II.   DESCRIPTION OF THE DEBTORS' BUSINESSES

### A.  The Debtors' Business Operations

Thomas Health is a nonstock, nonprofit corporation duly incorporated under the laws of the State of West Virginia. Thomas Health was formed in December 2006 in anticipation of the purchase of St. Francis by Thomas Memorial (described below). Thomas Health is the consolidated parent entity/holding company whose primary function is to serve as the controlling

body of the affiliated Debtors. It is the sole parent of Thomas Memorial, St. Francis and THSPP. The executive offices for Thomas Health are located at 4605 MacCorkle Avenue SW, South Charleston, West Virginia, 25309. Thomas Health is the 17th largest private employer in West Virginia. The Debtors collectively form a 391-bed hospital system that employs nearly 1700 full and part-time employees and an estimated 250 clinicians. Thomas Health's mission is to be the trusted, personal choice for wellness and quality care, focused on optimal individual health as well as enhancement of community wellness as a whole. Thomas Health consistently aspires to deliver an exceptional and compassionate patient experience, with superior clinical outcomes provided by engaged physicians and staff. Thomas Health is committed to maintain the highest standard of service, while continuing the missions of both Thomas Memorial and St. Francis. Together, these acute care Hospitals provide advanced technology to a larger community, with greater access to the highest quality of medical care.

Thomas Memorial is a nonstock, not-for-profit corporation duly incorporated under the laws of the State of West Virginia. Thomas Memorial opened in 1946. Thomas Memorial owns and operates health care facilities on its approximately 17-acre campus located in South Charleston, West Virginia. Thomas Memorial was named in memory of a South Charleston resident and West Virginia's Congressional Medal of Honor winner, Marine Corps Sergeant Herbert J. Thomas, Jr., who died in World War II after falling on a grenade to save his fellow soldiers. At the time of the issuance of the Series 2008 Bonds (described below), Thomas Memorial was an acute care community hospital with approximately 890,000 square feet of space that provided a comprehensive range of medical and surgical inpatient, emergency, and outpatient services. Thomas Memorial had 249 total beds, including 148 medical/surgical acute care, 16 critical care, 20 rehabilitation, 19 obstetrics, 18 behavioral health, 15 pediatric, and 5 level II intensive care nursery beds.

St. Francis is a nonstock, not-for-profit corporation duly incorporated under the laws of the State of West Virginia. St. Francis owns and operates health care facilities on its approximately nine-acre campus, which is located in Charleston, West Virginia. St. Francis was first-organized in 1913, and is focused on faith-based health care. The acute cure community hospital has approximately 550,000 square feet of space that provides a comprehensive range of medical and surgical inpatient, emergency and outpatient acute services. Inpatient services include acute medical and surgical, ICU/CCU and skilled nursing. The main campus houses two Therapeutic Cardiac Catheterization Labs, an Ambulatory Surgery Center, a Pain Management Center, a fixed MRI Facility and a Wound Care Center in addition to traditional acute care outpatient services. At the time of the Series 2008 Bond issuance, St. Francis' bed capacity was 142 beds, including 98 medical/surgical acute care, 15 critical care, and 29 skilled nursing beds. On January 1, 2007, St. Francis joined Thomas Health when Thomas Memorial purchased St. Francis from Lifepoint Health.

THSPP is a not-for-profit corporation duly incorporated under the laws of the State of West Virginia. Thomas Health is the sole corporate member of THSPP. THSPP employs physicians providing primary and specialty care to those served by the Hospitals. In total, THSPP employs approximately 125 people, including physicians and support staff. While its corporate office is the same as Thomas Memorial, its service locations are spread throughout the Kanawha Valley.

TMH Services is a for profit corporation duly incorporated under the laws of the State of West Virginia. Thomas Memorial is the sole corporate member of TMH Services. TMH Services is primarily a real estate holding company with interests in certain real property used by Thomas Health and the Hospitals. TMH Services' real estate allows Thomas Health to expand services and support of the Hospitals. TMH Services likewise provides real estate management services.

The Foundation for Thomas Memorial and St. Francis Hospitals, Inc. f/k/a The Thomas Memorial Hospital Foundation (the "Foundation") is a nonprofit corporation formed in 1989. The Foundation solicits, raises, holds, invests and distributes charitable contributions, gifts, bequests and devises for the purpose of providing support to the Hospitals. The Foundation ensures that all donations are stewarded directly toward the greatest needs of the Hospitals and the patients and communities the Debtors and the Foundation serve. The Foundation is part of the Obligated Group (as defined below).

The following is an organizational chart of the Debtors and non-debtor The Foundation.



## B. General Financial Information

As of September 30, 2019, the Debtors' books and records showed approximately $229,211,000 in assets, including $133,279,000 in property and equipment. The Debtors' total liabilities were approximately $240,703,000. For the twelve months ending September 30, 2019 ("FY 2019"), the Debtors recorded total revenues of approximately $267,415,000, an increase of approximately 1.4% from $263,837,000 in fiscal year 2018 ("FY 2018") and $266,725,000 in fiscal year 2017 ("FY 2017"). The Debtor's operating expenses (excluding depreciation, amortization and interest expenses) for FY 2019 were $253,278,000, an increase of 1.1% from approximately $250,399,000 in FY 2018 and $255,790,000 in FY 2017. For the 12 months ended September 30, 2019, the Debtors reported a net loss of approximately $6,588,425.

### C. The Debtors' Capital Structure

### 1.      The Series 2008 Bonds

Pursuant that certain Bond Trust Indenture dated as of June 1, 2008 (the "Bond Indenture"), as of June 30, 2008, the West Virginia Hospital Finance Authority ("WVHFA" or the "Issuer") issued its $148,920,000 Revenue Improvement Bonds (Thomas Health System, Inc.) Series 2008 (the "Series 2008 Bonds"), and the Issuer loaned the proceeds of the Series 2008 Bonds to the Hospitals. The Hospitals' obligation to repay such loan were secured by obligations issued pursuant to a Master Trust Indenture dated as of June 1, 2008, between Thomas Memorial, St. Francis and the Foundation (collectively, the "Obligated Group"), and United Bank, Inc. as Master Trustee, as supplemented and amended by a Supplemental Master Trust Indenture 2008-1, dated June 1, 2008, a Supplemental Master Indenture 2009-1, dated February 1, 2009, a Supplemental Master Trust Indenture 2009-2, dated July 1, 2009 (as amended and/or supplemented from time to time, the "Master Indenture"). Pursuant to the Master Indenture, the members of the Obligated Group executed and delivered to the Master Trustee concurrently with the issuance and as security for the repayment of the Series 2008 Bonds, the Series 2008-1A Note, the Series 2008-1B Note and the Series 2008-1C Note (collectively the "Series 2008 Notes"). Pursuant to the Supplemental Master Trust Indenture 2009-2, dated July 1, 2009, Thomas Health became a party to the Master Indenture and a member of the Obligated Group after it received a determination letter from the Internal Revenue Service that it was a qualified 501(c)(3) not-for-profit organization.

The proceeds of the Series 2008 Bonds were loaned to the Debtors pursuant to a Loan Agreement dated as of June 1, 2008, between the WVHFA and the Hospitals. The Debtors used the proceeds of the Series 2008 Bonds to: (i) refinance $45 million of outstanding short term debt that was used to finance the acquisition of St. Francis, (ii) construct a new six story pavilion on the South Charleston campus for approximately $70,000,000, and (iii) provide $10 million for capital expenditures for fiscal year 2009. The Series 2008 Bonds allowed Thomas Memorial to: (i) increase its licensed bed capacity to 260 beds; (ii) increase all private rooms by 30% and offer these rooms to all acute and obstetric patients; (iii) provide a 30% increase in operating rooms; and (iv) provide a 33% increase in procedure rooms. The Series 2008 Bonds also allowed St. Francis to convert to all private rooms, making it the only facility in the area with all private rooms for acute and obstetric patients.

Pursuant to the Master Indenture, the Bond Indenture, the Credit Line Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing executed and delivered by Thomas Memorial, and the Credit Line Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing executed and delivered by both Thomas Memorial and St. Francis, the Master Trustee was granted a security interest in, substantially all of the Debtors' assets.

Prior to the Petition Date, the Obligated Group defaulted on the scheduled October 1, 2019 debt service payment on the Series 2008 Bonds. As of the Petition Date, the outstanding amount owed pursuant to the Series 2008 Bonds includes: (i) principal in the amount of $137,910,000, (ii) accrued but unpaid interest in the amount of $7,005,728.75, and (iii) accrued and unpaid fees and expenses of the Bond Trustee, less the amount of the Indenture Funds.

### 2. Capital Leases

The Debtors have a variety of capital leases of varying terms with Stryker, Cisco Systems, Inc., GE Healthcare, Automatic Data Processing Inc., Alcon, and Bausch & Lomb (collectively, the "Capital Leases"). The aggregate amount of debt owed on the Capital Leases is approximately $5,131,681 as of the date of this Disclosure Statement.

### 3. The TMH Pension Plan

The Retirement Plan for Employees of Herbert J. Thomas Memorial Hospital, as Amended and Restated, Effective January 1, 2016 (the "TMH Pension Plan"), is a defined benefit pension plan covered by the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and insured by the Pension Benefit Guaranty Corporation ("PBGC"). The TMH Pension Plan is sponsored by Thomas Memorial. All other Debtors are members of the plan sponsor's controlled group and, with the plan sponsor Thomas Memorial, have joint and several liability with respect to the TMH Pension Plan. The TMH Pension Plan provides pension benefits to approximately 1,525 participants. As of January 1, 2012, the TMH Pension Plan was amended such that there were no new participants in the TMH Pension Plan after December 31, 2011. Due to the increasing costs of maintaining the TMH Pension Plan, on September 5, 2015 the Debtors froze future benefit accruals. As set forth in the Plan, the Debtors seek to terminate the TMH Pension Plan through either a distressed termination under 4041(c) of ERISA, or through an involuntary termination commenced by the PBGC under 4042 of ERISA. The Debtors have yet to file a distress termination application with the PBGC or a motion seeking the Bankruptcy Court's determination that Thomas Memorial and its debtor affiliates meet the requirements for a distress termination of the TMH Pension Plan under the tests set forth in ERISA 4041(c) in light of ongoing discussions and negotiations with the PBGC. The PBGC likewise has not commenced steps for agency action to terminate the TMH Pension Plan under ERISA 4042. Based on information provided to the Debtors by the PBGC, the Debtors estimate that upon termination of the TMH Pension Plan, their obligations to the PBGC will include an unsecured obligation of approximately $74,000,000 against each Debtor. In addition, the Reorganized Debtors shall pay to PBGC termination premiums pursuant to ERISA 4006 that will be due in the amount of approximately $5.6 million. As detailed in Article VIII of the Plan, PBGC reserves its rights to pursue claims on behalf the TMH Pension Plan and itself. The Debtors likewise reserve all rights with respect to any Claims filed by the PBGC.

### 4. Trade Debt

The Debtors incur trade indebtedness in the ordinary course of business. Primarily, this unsecured debt relates to the purchase of goods and services for the Hospitals. The Debtors estimate the Claims of unsecured trade creditors to be approximately $19,000,000 for the prepetition period.

### III.    EVENTS LEADING UP TO THE CHAPTER 11 CASES

### A. Prepetition Restructuring Efforts

### 1.    Cost Cutting and Revenue Initiatives

Faced with these challenges, the Debtors took affirmative measures to cut costs and enhance revenue starting in 2016. The Debtors, in consultation with third party advisors, implemented approximately 85 cost-cutting initiatives, which have resulted in millions of dollars in cost savings. The savings in 2018 and 2019 were approximately $9.6 million and $6.9 million, respectively. The Debtors also began to develop revenue enhancement plans that included specific capital improvement initiatives that would not only benefit patients from a care perspective, but also have already yielded positive financial results and are projected to further increase revenues in the future. The Debtors expanded their physician practices, installed three new state of the art cardiac catheterization labs, installed a state of the art linear accelerator, implemented a 340B pharmacy program (under the 340B Drug Pricing Program), expanded its endoscopy center at St. Francis, and added the inpatient addiction healing center at St. Francis.

### 2.    The Debtors' Efforts to Restructure the Series 2008 Bonds

Beginning in 2016, the Debtors attempted to engage United Bank, Inc. (the former trustee under the Bond Indenture) in discussions regarding a restructuring of the payments due under the Series 2008 Bonds (the "Bond Debt"), because the debt was negatively impacting the Debtors' financial condition and operations. In addition to making the Debtors vulnerable to the worsening economic conditions discussed above, the Bond Debt was reducing the Debtors' ability to use cash flow to fund capital expenditures and operating expenses.

On or about August 16, 2018, UMB Bank. N.A. replaced United Bank, Inc. as the Bond Trustee. The Debtors promptly contacted the Bond Trustee in an effort to initiate discussions regarding a restructuring of the Bond Debt to a more sustainable level that would allow the Debtors to reinvest in their operations and facilities in order to further their mission. The Bond Trustee requested that the Debtors run a process to determine whether an alternative to a restructuring of the debt by Bondholders existed. To that end, the Debtors, in certain consultation with the Bond Trustee and its professionals commenced a pre-chapter 11 process to explore strategic alternatives, including sale and refinancing opportunities, in February of 2019 (the "Strategic Process"). On February 22, 2019, the Debtors retained SOLIC Capital, LLC and SOLIC Capital Advisors, LLC (collectively, "SOLIC") to assist them in a search for both strategic buyers and financing alternatives.

SOLIC conducted pre-marketing diligence, developed solicitation materials and prospective bidder/financing target lists, and established an electronic data room for interested parties to conduct due diligence. In April 2019, solicitation materials and target lists were shared with and approved by the Debtors and later shared with the Bond Trustee. On April 15, 2019, SOLIC transmitted a teaser to 111 parties: 45 strategic parties and 66 financial parties identified on the target list. From those parties contacted, 34 parties executed confidentiality agreements as a prerequisite to receive a confidential information memorandum. Following review of the memorandum, 30 of the 34 parties withdrew at a preliminary stage in the process.

In May 2019, four parties submitted preliminary written indications of interest to SOLIC and the Debtors – two strategic parties expressed an interest in a potential acquisition and two financial institutions expressed an interest in potential financing alternatives. From June 2019 through December 2019, the interested parties conducted due diligence, which included, among other things, review of the Debtors' books and records, multiple management meetings, diligence-related conference calls, facility tours and onsite visits. During this period, one financing party elected to withdraw from the process and Hamlin Capital Management, LLC ("HCM") later joined the process expressing an interest in refinancing the Bond Debt. The Debtors, with the assistance of their advisors and in consultation with the Bond Trustee and its professionals, analyzed and vetted the various alternatives, which included, among other things, the negotiation of updated proposals and definitive transaction terms as well as preparation of related documentation. That process continued into the latter part of December 2019. However, because the terms of certain proposals contained covenants that required prompt action, coupled with the other facts and circumstances referenced above, the Debtors filed the Chapter 11 Cases to preserve and potentially avail themselves of strategic opportunities that would not only serve the best interests of all parties in interest, but also likewise serve their mission and commitment to their employees, patients and the surrounding communities.

## IV.   EVENTS DURING THE CHAPTER 11 CASES

### A.   Commencement of the Chapter 11 Cases

On January 10, 2020, Debtors, Thomas Health, Thomas Memorial, Saint Francis and THSPP each filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. On May 22, 2020, TMH Services filed its voluntary petition under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases were assigned to the Honorable Frank W. Volk. The Debtors have continued in the management and possession of their businesses and properties as debtors in possession since the Petition Date. No trustee or examiner has been appointed in the Chapter 11 Cases.

### B.   First-Day Relief

On the Petition Date and January 12, 2020, the Debtors filed various motions or applications seeking typical "first-day" relief in their Chapter 11 Cases (collectively, the "First Day Motions"), as well as declarations in support thereof, in order to ensure a smooth transition into bankruptcy and to allow the Debtors to continue to operate their businesses and administer their Estates. On February 25, 2020, the Debtors obtained a number of final orders on the First Day Motions granting various forms of relief that the Debtors deemed essential to facilitating their transition into chapter 11.

### C.   Use of Cash Collateral

To ensure that the Debtors would be able to satisfy their immediate need for access to cash after the Petition Date to maintain their operations during the course of these Chapter 11 Cases, on January 13, 2020, the Debtors filed a motion for authority to use cash collateral and grant certain adequate protection to the Bond Trustee [Docket No. 37]. On January 15, 2020, the Bankruptcy Court approved the use of cash collateral on an interim basis [Docket No. 89] (the

"Interim Cash Collateral Order"). The Bankruptcy Court extended the Interim Cash Collateral Order pursuant to three stipulations and consent orders [Docket Nos. 214, 286 and 373]. On March 30, 2020, the Court entered the *Final Order (A) Authorizing The Use Of Cash And Other Collateral, (B) Granting Adequate Protection, And (C) Granting Related Relief* [Docket No. 475].

### D. Debtors' Retention of Professionals and Noticing Agent

The Debtors filed the applications to employ and retain the following Professionals to represent them in the Chapter 11 Cases: Whiteford Taylor & Preston, LLP as bankruptcy counsel; Frost, Brown Todd, LLP as local bankruptcy counsel; SOLIC Capital Advisors, LLC and SOLIC Capital, LLC as investment banker; Jackson Kelly PLLC as special counsel; Arnett Carbis Toothman, LLP as auditors and accountants; and Force Ten Partners, LLC as financial advisors. The Bankruptcy Court approved the retention of all of the Professionals. On the Petition Date, the Debtors also filed an application to retain Omni Management Group ("Omni" or the "Noticing Agent") as notice, claims and solicitation agent in connection with the Chapter 11 Cases. The Bankruptcy Court granted the Debtors' application by order entered January 15, 2020 [Docket No. 86].

### E. Appointment of the Creditors Committee

On January 29, 2020, the U.S. Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 129], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Creditors Committee") in the Chapter 11 Cases. The Creditors Committee is comprised of: (1) Pension Benefit Guaranty Corporation; (2) Security America; (3) Kanawha County Emergency; (4) Arthrex, Inc.; (5) Beckman Coulter, Inc.; and (6) Colonial Consulting Group, Inc.

### F. Establishment of the Bar Dates

On January 21, 2020, the Clerk of the Bankruptcy Court issued a *Notice of Chapter 11 Bankruptcy Case* which fixed May 25, 2020 as the last day for the filing of Proofs of Claim in the Chapter 11 Cases. Thereafter, the Debtors filed a motion to establish additional deadlines for filing all Claims against the Debtors arising prior to the Petition Date, including Claims of Governmental Units [Docket No. 404] (the "Bar Date Motion"). By Order entered on April 13, 2020 (the "Bar Date Order"), the Bankruptcy Court approved the Bar Date Motion. The Bar Date Order provides that each Entity asserting a claim against the Debtors that arose before the Petition Date, including, without limitation, claims arising under section 503(b)(9) of the Bankruptcy Code, must file an original Proof of Claim by the following deadlines (the "Bar Dates"):

(i)      Except in the cases of Governmental Units and certain other exceptions explicitly set forth in the Bar Date Order, each claimant must file its Proof of Claim so that Omni actually receives that Proof of Claim on or before July 31, 2020, at 5:00 PM (prevailing Eastern time) (the "General Claims Bar Date"). The General Claims Bar Date applies to all types of Claims against the Debtors arising or deemed to

have arisen before the Petition Date, except for Claims specifically exempt from complying with the applicable Bar Dates as set forth in the Bar Date Order;

(ii)     Each Governmental Unit Holding a Claim against a Debtor (whether secured or unsecured priority or non-priority) that arose prior to the Petition Date, including any Governmental Unit with a Claim against a Debtor for unpaid taxes, whether such Claim arose from a prepetition tax period or prepetition transaction to which a Debtor was a party, must file its Proof of Claim so that Omni <u>actually receives the Proof of Claim on or before August 31, 2020, at 5:00 PM (prevailing Eastern time)</u> (the "Governmental Claims Bar Date");

(iii)     Unless otherwise ordered, each Entity asserting a Claim as a result of the Debtors further amending their Schedules must file a Proof of Claim with respect to such claim so that Omni <u>actually receives the Proof of Claim by the later of: (i) the General Claims Bar Date or the Governmental Claims Bar Date, as applicable; or (ii) 5:00 PM (prevailing Eastern time) on the date that is twenty-one (21) days after service of any amendment(s) to the Schedules</u>; and

(iv)     Unless otherwise ordered, each entity asserting a Claim arising from the rejection of an Executory Contract or Unexpired Lease must file a Proof of Claim on account of such rejection so that Omni <u>actually receives the Proof of Claim on or before the later of (a) the General Claims Bar Date or the Governmental Claims Bar Date, as applicable, and (b) 5:00 PM (prevailing Eastern time), on the date that is 21 days following entry of a final order approving the rejection of the applicable Executory Contract or Unexpired Lease</u>.

Each Entity submitting a Proof of Claim must do so such that Omni *actually receives* the Proof of Claim on or before the applicable Bar Date. If Omni does not actually receive an Entity's Proof of Claim on or before the applicable Bar Date, except as otherwise explicitly set forth in the Bar Date Order, that Entity will be barred from asserting the underlying Claim, including any such Claim asserting priority under section 503(b)(9) of the Bankruptcy Code, against any Debtor (or filing a Proof of Claim with respect to such claim) and, further, be prohibited from voting to accept or reject the Plan, participating in any distribution in these Chapter 11 Cases on account of the applicable Claim or receiving further notices regarding or on account of such Claim.

## G.  The COVID-19 Pandemic

Over the last several months, the unprecedented, exponential spread of Coronavirus disease COVID-19 has wreaked economic and social havoc across the country. On March 11, 2020, the World Health Organization declared the COVID-19 outbreak to be a pandemic.[2] On March 13, 2020, President Donald J. Trump declared a national emergency in response to the COVID-19 outbreak.[3] Separately, on March 16, 2020, the Governor of West Virginia, Jim

---

[2] World Health Organization, WHO Director-General's opening remarks at the media briefing on COVID-19, March 11, 2020 (https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-themedia-briefing-on-covid-19---11-march-2020).
[3] Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, dated March 13, 2020

Justice, also declared a state of emergency in West Virginia.[4] To further combat the spread of COVID-19 in West Virginia, on March 23, 2020, Governor Justice issued a Stay at Home order effective March 24, 2020, at 8:00 p.m.[5] The order directs all West Virginians to stay at home and limit movements outside of their homes beyond essential activities. In addition, subject to certain exceptions, the order requires all non-essential businesses to cease operations. Under the order, hospitals are considered essential businesses and may remain open, but hospital and other healthcare providers may only provide non-elective medical care and treatment. On March 29, 2020, Governor Justice issued another order to suspend, effective April 1, 2020, all elective medical procedures.[6] The order states "that all elective medical procedures are hereby prohibited; provided that patients will still have access to urgent, medically necessary procedures like those needed to preserve the patient's life or long-term health; and provided that this prohibition applies equally to all types of elective medical procedures performed in hospitals, offices, and clinics throughout the state."

Additionally, the Department of Homeland Security and Emergency Management has taken steps to establish Alternate Care Sites ("ACS") in accordance with Governor Justice's executive order to address the COVID-19 pandemic. The purpose of ACS is to accept and care for the overflow of patients requiring care for COVID-19-related illnesses when existing facilities reach their capacity. Thomas Health and the West Virginia Department of Health and Human Resources have agreed to establish a portion of St. Francis Hospital, as an ACS. In addition to providing the services it currently offers, St. Francis has allocated a maximum of 96 beds for the purpose of providing direct patient care and ancillary services to patients who have tested positive for COVID-19 and patients suspected of having contracted COVID-19. St. Francis has consolidated and separated existing services from the Alternate Care Site. DHHS along with other state and federal partners will provide funding for the ACS. DHHS will cover costs associated with transitioning and upgrading facilities to accommodate the ACS, staffing costs, equipment costs (including pulmonary facilities for all 96 beds), and operational costs. ACS services at St. Francis are expected to continue through September 30, 2020 or until the cases of COVID-19 diminish.

Notwithstanding the careful planning and modeling of the Debtors and their advisors, these extraordinary and unprecedented events relating to the COVID-19 pandemic have resulted in drastic changes to the Debtors' present financial situation including, declines in volume and revenue and furloughs of employees.

## H. The Challenge Litigation

On June 11, 2020, the Creditors Committee initiated the Challenge Litigation by filing a *Complaint for Declaratory Judgment and Related Relief* against the Bond Trustee in the Bankruptcy Court styled as *The Official Committee of Unsecured Creditors of Thomas Health, Inc., et al. v. UMB Bank, National Association, et al.*, Adversary Proceeding No. 2:20-ap-02007

---

(https://www.whitehouse.gov/presidentialactions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19- outbreak/).

[4] https://governor.wv.gov/Documents/2020%20Proclamations/State-of-Emergency-March-16-2020.pdf.

[5] https://governor.wv.gov/Documents/2020%20Executive%20Orders/STAY-AT-HOME-ORDER-MARCH-23-2020.pdf

[6] https://governor.wv.gov/Documents/EO%2016-20electiveprocedures.pdf

(the "Adversary Complaint"). By the Challenge Litigation, the Creditors Committee asserts certain purported claims and causes of action based upon the Challenge Rights. Specifically, the Creditors Committee is seeking (i) a declaratory judgment that the Obligated Debtors' Unencumbered Property (as defined in the Adversary Complaint) is not subject to the liens or security interests of the Bond Trustee and can be distributed to unsecured creditors in the Chapter 11 Cases consistent with the priorities set forth in the Bankruptcy Code; (ii) a declaratory judgment that, to the extent the Bond Trustee was granted a security interest in the Unencumbered Deposit Accounts (as defined in the Adversary Complaint), such interests are unperfected and the funds in such accounts can be distributed to unsecured creditors in the Chapter 11 Cases; (iii) an order avoiding any unperfected security interests in the Unencumbered Deposit Accounts pursuant to section 544 of the Bankruptcy Code and recovering and/or preserving the value thereof under sections 550 and 551 of the Bankruptcy Code; (iv) a determination pursuant to section 506(a) of the Bankruptcy Code that the Series 2008 Bond Claims are secured only to the extent of the value of the collateral in which the Bond Trustee holds properly perfected liens and enforceable security interests; and (v) the objection to, and disallowance of the Series 2008 Bond Claims pursuant to section 502(d) of the Bankruptcy Code until the Court enters judgment on the Adversary Complaint by final order.

The claims asserted by the Creditors Committee in the Challenge Litigation are disputed on multiple grounds as a matter of fact and law. Among other matters, the Bond Trustee believes that the matters asserted in the Challenge Litigation do not account for the Bond Trustee's Diminution Claims, or the Bond Trustee's agreement, subject to the implementation of the proposed settlement, for the Debtors to apply substantially all of the cash and investments that are the primary assets in dispute to pay costs and expenses under the Plan, including Allowed cure claims, Allowed claims entitled to priority under Section 503(b)(9), Allowed priority unsecured claims, Allowed Professional Fees, Allowed Administrative Claims, and to meet the liquidity requirements for the Debtors obtain the financing to exit the Chapter 11 Cases. The Challenge Litigation remains pending as of the date of this Disclosure Statement.

## I.    The Siemens Contracts

Siemens Medical Solutions USA, Inc. ("Siemens") and Thomas Health are party to several pre-petition contracts concerning the purchase of certain "Cath Lab" systems by Thomas Health from Siemens (the "Equipment Contracts") and the servicing thereof after expiration of certain warranty periods under the Equipment Contracts (the "Service Contracts"). Additionally, Siemens and Thomas Health are party to three (3) separate contracts for the purchase of certain "accessories" to the Cath Labs (the "Accessories Contracts" and collectively with the Equipment Contracts and Service Contracts, the "Siemens Contracts"). The Siemens Contracts are vital to the Debtors' reorganization and financial health. A Cath Lab is a specialized piece of equipment used for imaging and examining the heart by performing cardiac catheterizations and is a vital piece of equipment for the Hospitals. The Cath Labs generate approximately $8,050,000 yearly for the Debtors, and are a critical component to the Debtors' reorganizations.

On April 2, 2020, Siemens filed its *Motion to Compel Assumption or Rejection of Executory Contracts and Grant Allowance of Administrative Claim with Respect to any Rejected Contracts, or, in the Alternative, for Relief from the Automatic Stay* [Dkt. No. 501] (the "Motion to Compel"), pursuant to which, Siemens seeks to compel the Debtors to assume or reject the

Equipment Contracts and the Service Contracts. The Debtors, in the exercise of their sound business judgment, have determined to assume the Siemens Contracts. The Debtors and Siemens reached an agreement to resolve the Motion to Compel and the treatment of the Siemens Contracts in the Chapter 11 Cases which enables the Debtors to cure defaults thereunder over a period of months. The agreement provides for the Debtors to pay Siemens to enter into a certain Master Contract Amendment that provides for the assumption of the Siemens Contracts and the payment of the amounts owing under the Equipment Contracts and Accessories Contracts, which total approximately $1,415,000. The Bond Trustee and the Creditors Committee have opposed the Debtors' proposed settlement with Siemens, and the Motion to Compel remains pending at this time. Given the importance of the Cath Labs to the Debtors' operations, and the benefit conferred upon the Debtors in connection with the extended payment plan, the Debtors intend to file a motion to assume the Siemens Contracts and/or otherwise designate the Siemens Contracts for assumption in connection with the Plan.

### J.  Exit Financing

The Plan will be funded by exit financing provided by certain funds advised by or management by Rosemawr.

After the Petition Date, the Debtors continued the Strategic Process and selected an exit loan transaction proposed by HCM to provide resources necessary for the Debtors' planned exist from the Chapter 11 Cases. On June 9, 2020, the Debtors executed a Financing Commitment Letter with HCM whereby HCM agreed to refinance the Bond Debt (the "Proposed HCM Financing"). The Proposed HCM Financing included the issuance of bonds with a par amount of $60.1 million of tax exempt and taxable bonds, with the final par amount to be determined, and up to $13 million of the bonds to be taxable. Among other uses, proceeds of the bonds, together with other resources of the Debtors, were to be used to make a $47 million payment to the Bond Trustee on the Effective Date on account of the Series 2008 Bond Claims. The Debtors' Joint Plan of Reorganization dated July 7, 2020 (the "Original Plan"), was based upon and incorporated the terms of the Proposed HCM Financing.

Subsequent to the Debtors' filing of the Original Plan, certain funds advised or managed by Rosemawr purchased the majority of the outstanding Series 2008 Bonds. Rosemawr is an investment manager with over $1 billion under management, focused exclusively on municipal and not-for-profit borrowers, and has extensive experience in not-for-profit healthcare, including distressed borrowers. Upon reviewing the Original Plan, Rosemawr submitted an alternative to the Proposed HCM Financing. Rosemawr's proposed refinancing (the "Rosemawr Financing"), which is set forth in a Term Sheet dated August 2, 2020 (the "Rosemawr Term Sheet"), provides materially better economic terms to the Debtors and their estates as compared to the Proposed HCM Financing. Similar to that financing, Rosemawr proposes to purchase 60.1 million in of the Series 2020 Bonds to be issued by the WVHFA on behalf of the Debtors. However, the Rosemawr Financing will result in immediate up-front savings of over $5.8 million as compared to the Proposed HCM Financing. In addition, due to lower interest rate, longer maturity, and longer interest only period, the Debtors will benefit from significant ongoing cash flow savings, estimated at over $3.8 million through 2030 compared to the Proposed HCM Financing. Additionally, the Debtors will no longer be exposed to the refinancing risk associated with a bullet maturity after 10 years, as was required under the Proposed HCM Financing.

After consideration of all of the terms of Proposed HCM Financing and the Rosemawr Financing, the Debtors have determined, in the exercise of their business judgment and their fiduciary duty to their creditors, to move forward with the Rosemawr Financing. The upfront savings of approximately $5.8 million will be distributed to the Holders of the Allowed Series 2008 Claims. Moreover, the ongoing savings and more favorable financial and other covenants under the Rosemawr Financing will bolster the decision of the Debtors to increase the Plan distributions to General Unsecured Creditors by $6.25 million.

### K. The Global 9019 Settlement

The Debtors have continued to negotiate with the Creditors Committee and the Bond Trustee regarding the issues raised in the Challenge Litigation and objections the Creditors Committee raised with respect to the Disclosure Statement and the Original Plan. Ultimately, the Debtors, the Bond Trustee and the Creditors Committee reached a comprehensive settlement and compromise resolving all of the parties' issues in the Chapter 11 Cases, the terms of which are embodied in the Global 9019 Settlement. The proposed settlement resolves, among other things, the Debtors' obligations associated with their senior secured indebtedness, the Series 2008 Bond Claims and General Unsecured Claims, and the remaining litigation pending between the Bond Trustee and the Creditors Committee in these proceedings. The Plan is centered around the Global 9019 Settlement. The specific terms of the Global 9019 Settlement are set forth in greater detail below and in Article IV.A of the Plan.

## V.   SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS <u>EXHIBIT A</u>. THIS SUMMARY DOES NOT PURPORT TO BE COMPLETE, AND CREDITORS ARE URGED TO READ THE PLAN IN FULL.

### A. Summary of Classes and Treatment of Claims

#### 1.   Classified Claims

Summarized in the table below are the classification of Claims, the estimated aggregate amount of Claims in each Class that ultimately will be Allowed, the estimated amount and nature of distributions to Holders of Claims in each Class of Claims, and the treatment provided for in the Plan for classified Claims. A summary description of the treatment of Claims that are not classified under the Plan, such as Administrative Claims and Priority Tax Claims, follows the table.

*The dollar amounts included in the following table are estimates only and do not constitute an admission by the Debtors as to the validity or amount of any particular Claim. The Debtors reserve all rights to dispute the validity or amount of any Claim that has not already been established by the Bankruptcy Court or that is not otherwise Allowed under the Plan. The summary of estimated distributions under the Plan set forth below lists both estimated Allowed amount of Claims in each Class and an estimated percentage recovery for such Class. The estimated aggregate amounts of all Classes of Claims are based on the Debtors' good faith estimates of the aggregate amount of such*

31

*Claims upon resolution of all such Claims that are Disputed Claims, based on all currently known information. Certain of those Disputed Claims are material, and the total asserted amount of all such Claims, including Disputed Claims, is materially in excess of the total amount of Allowed Claims assumed in the estimates listed below. The amount of any Disputed Claim that ultimately is Allowed by the Bankruptcy Court may be significantly more or less than the estimated Allowed amount of such Claim. In addition, the actual ultimate aggregate amount of unclassified Claims, such as Administrative Claims and Priority Tax Claims, may be significantly higher or lower than is estimated. Accordingly, the amount of the distribution of Cash that ultimately will be received by a particular Holder of an Allowed Claim (other than the payments to be made on the Effective Date in connection with the Global 9019 Settlement) may be adversely or favorably affected by the aggregate amount of Claims ultimately Allowed in such Class and by the aggregate amount of Administrative Claims and Priority Tax Claims ultimately allowed.*

*For all of the reasons stated above, other than the payments to be made on the Effective Date in connection with the Global 9019 Settlement, no representation can be made, or is being made, with respect to whether the estimated Allowed amount of Claims in each Class will be accurate or whether the estimated percentage recoveries shown on the table below will be realized by the holder of an Allowed Claim in any particular Class.*

The following is a table of estimated allowed amounts for each Class of Claims.

| Class | Estimated Allowed Claims | Summary of Treatment |
|---|---|---|
| Class 1 - Series 2008 Secured Bond Claims | $144,915,729 | In accordance with the Global 9019 Settlement, in full and final satisfaction, settlement, release and discharge of the Series 2008 Secured Bond Claims, the Series 2008 Secured Bond Claims shall be Allowed in the amount of $58,238,380 and the Bond Trustee shall receive without setoff, recoupment, subordination or reduction the Series 2008 Bond Payment in Cash from the Reorganized Debtors on the Effective Date, plus the Indenture Funds. |
| Class 2 - Other Secured Claims | $10,307,727[7] | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release and discharge of the Other Secured Claims, on or as soon as reasonably practicable after the later of: (i) the Effective Date and (ii) the date that is thirty (30) days after the date such Other Secured Claim is Allowed, each Allowed Other Secured Claim that has priority over the Series 2008 Bond Claims will be satisfied at the option of the Debtors by: (a) Cash in an amount equal to one hundred percent (100%) of the Allowed Other Secured Claim; (b) the return of the collateral subject to any senior, perfected |

---

[7] Inclusive of capital leases in the amount of $5,131,681 and mortgages in the amount of $5,175,046.

and indefeasible lien or security interest; (c) recommencement of payment by the Reorganized Debtors of the monthly obligation due pursuant to the pre-existing contract/security agreement; or (d) such other treatment as the Debtors and such Holder of an Other Secured Claim may agree.

| | | |
|---|---|---|
| Class 3 - Other Priority Claims | $290,990 | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release and discharge of the Allowed Other Priority Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either: (i) payment in full in Cash; (ii) deferred Cash payments of a value, as of the Distribution Date, equal to the Allowed Priority Claim; or (iii) such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| Class 4 - Convenience Claims | $50,000 | Treatment: On, or as reasonably practicable after, the later of (i) the Distribution Date and (ii) the date that is thirty (30) days after the date such Convenience Claim becomes an Allowed Convenience Claim, each Holder of an Allowed Convenience Claim shall receive in full and final satisfaction, settlement, release and discharge of such Allowed Convenience Claim, Cash in an amount equal to the lesser of (A) five hundred dollars ($500) and (B) the Allowed amount of such Holder's Convenience Claim; provided, however, that the total distribution to Holders of Allowed Convenience Claims under the Plan shall not exceed fifty thousand dollars ($50,000) (the "Convenience Class Cap"), and if the foregoing treatment would result in distributions to Holders of Allowed Convenience Claims that exceed the Convenience Class Cap in the aggregate, each Holder of an Allowed Convenience Claim will instead receive a Pro Rata Share of fifty thousand dollars ($50,000), with the amount of each such Holder's Convenience Claim fixed at the lesser of (x) five hundred dollars ($500) and (y) the Allowed amount of such Holder's Convenience Claim for the purpose of determining its Pro Rata Share. |
| Class 5 - General Unsecured Claims | $93,154,595[8] | Treatment: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, including as set forth below with respect to the Bond Deficiency Claims, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, release |

---

[8] Note that the estimate of all Allowed General Unsecured Claims is $179,831,944. However, under the Global 9019 Settlement, the Bond Trustee has agreed that the Bondholders shall only receive in the aggregate $1 on account of the Bond Deficiency Claims – which claims total $86,677,349.

and discharge of its Allowed General Unsecured Claim, a Pro Rata Share of the $7,000,001 GUC Distribution, on or as soon as reasonably practicable after the later of: (i) thirty (30) days after the Effective Date or (ii) the date that is thirty (30) days after the date such General Unsecured Claim is Allowed.

These estimates are approximate and based upon a number of assumptions and represent reductions in the aggregate face amount of Claims Filed. There is no guarantee that the ultimate amount of each category of Claims will conform to the estimates stated herein. Some of the Claims underlying such estimates are subject to challenge, and the assertions of the Debtors are subject to challenge by the Holders of such Claims. The Debtors believe that certain Claims are without merit and intends to object to all such Claims. There can be no assurance that the Debtors will be able to achieve the reductions set forth above. Moreover, additional Claims may be filed or identified during the Claims objection period that may materially affect the foregoing estimates, including Administrative Claims, which must be filed no later than thirty (30) days after the Effective Date.

## 2.    Unclassified Claims

Under the Plan, Administrative Claims and Priority Tax Claims have not been classified. The following is a summary of the treatment of such Claims:

(a)    <u>Administrative Claims</u> - unless otherwise agreed to by the Holders of an Allowed Administrative Claim and the Debtors, or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim.

(b)    <u>Professional Fee Claims</u> - The Reorganized Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals when such Professional Fee Claims are Allowed by entry of a Final Order of the Bankruptcy Court. All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed by the date that is not later than forty-five (45) days after the Effective Date.

(c)    <u>Priority Tax Claims</u> - Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## B.  Overview of the Plan

The Plan is a plan of reorganization. Under the Plan, the Debtors will make the payments described below to their creditors in full satisfaction of their Claims against the Debtors. The Debtors will continue to own the Hospitals after the Effective Date of the Plan. As set forth in the Plan, the transactions contemplated by the Plan provide for a comprehensive restructuring of

Claims against the Debtors, de-lever the Debtors' capital structure and preserve the going-concern value of the Debtors' businesses, maximize recoveries available to all constituents, and protect the jobs of the Debtors' employees.

### C.  Voting Procedures and Confirmation Requirements

#### 1.       Ballots and Voting Deadlines

Accompanying this Disclosure Statement is a Ballot for acceptance or rejection of the Plan. The Bankruptcy Court has established 5:00 p.m., Eastern Time, on August 11, 2020 (the "Voting Deadline") as the deadline for casting a Ballot to accept or reject the Plan. The Bankruptcy Court has directed that, to be counted for voting purposes, except for Claims that are Series 2008 Bond Claims, Ballots for the acceptance or rejection of the Plan must be either: (a) electronically    submitted    by    way    of    the    Noticing    Agent's    website https://omniagentsolutions.com/thomas by 4:59:59 PM Eastern Time on the Voting Deadline; or (b) actually received by the Noticing Agent by 5:00 p.m., prevailing Eastern Time, on the Voting Deadline at the following addresses, as specified on each Holders' Ballot:

> **Thomas Health System, Inc., et al. Solicitations**
> **c/o Omni Agent Solutions**
> **5955 De Soto Ave., Suite 100**
> **Woodland Hills, CA 91367**

Ballots associated with Series 2008 Bond Claims shall be submitted at the times and using the matter specified therein.

Ballots not actually received by the Voting Deadline may not be counted, and any Ballot which is executed by the Holder of an allowed claim but which does not indicate an acceptance or rejection or which indicates both an acceptance and rejection of the Plan shall not be counted.

It is important for all Creditors that are entitled to vote on the Plan to exercise their right to vote to accept or reject the Plan. Even if you do not vote to accept the Plan, you may be bound by the Plan if it is accepted by the requisite Holders of Claims and confirmed by the Bankruptcy Court.

#### 2.       Parties in Interest Entitled to Vote

Any Holder of a Claim against the Debtors whose Claim has not been Disallowed previously by the Bankruptcy Court is entitled to vote to accept or reject the Plan if such Claim belongs to an Impaired Class (see Subsection 3 below) under the Plan and either (a) has been scheduled by the Debtors and is not scheduled as disputed, contingent or unliquidated, or (b) such Holder has filed a proof of Claim before the Bar Date. In addition, any Claim to which an objection has been filed is not entitled to vote unless the Bankruptcy Court, upon application of the Holder of the Claim, temporarily allows the Claim in an amount that it deems proper for the purpose of accepting or rejecting the Plan. Any such application must be heard and determined by the Bankruptcy Court on or before the Voting Deadline. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### 3.    Definition of Impairment

Pursuant to section 1124 of the Bankruptcy Code, a class of claims is impaired under a plan unless, with respect to each claim of such class, the plan:

(1) leaves unaltered the legal, equitable, and contractual rights of the holder of the claim or equity interest; or

(2) notwithstanding any contractual provision or applicable law that entitles the holder of a claim or equity interest to demand or receive accelerated payment of such claim or equity interest after the occurrence of a default:

> (A) cures any such default that occurred before or after the commencement of the cases under the Bankruptcy Code, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code;

> (B) reinstates the maturity of such claim or interest as it existed before such default;

> (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law;

> (D) if such claim or such interests arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the Holder of such claim or such interest (other than the debtor or an insider) for actual pecuniary loss incurred by such Holder as a result of such failure; and

> (E) does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

**The following Classes are Impaired under the Plan and entitled to vote:**

- **Class 1 - Series 2008 Secured Bond Claims**
- **Class 4 - Convenience Claims**
- **Class 5 - General Unsecured Claims**

## D.  Confirmation Procedure

### 1.    Confirmation Hearing

A hearing before the Honorable Frank W. Volk, United States Bankruptcy Judge, has been scheduled for <u>August 15, 2020 at 10:00 a.m. Eastern Time</u>, at the United States Bankruptcy Court for the Southern District of West Virginia, Robert C. Byrd U.S. Courthouse, 300 Virginia Street East, Room 3200, Charleston, West Virginia 25301, to consider confirmation of the Plan. The Confirmation Hearing may be adjourned from time to time by the

Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

**CREDITORS ARE NOT REQUIRED TO ATTEND THE CONFIRMATION HEARING UNLESS THEY HAVE EVIDENCE OR ARGUMENT TO PRESENT TO THE BANKRUPTCY COURT CONCERNING THE MATTERS TO BE ADDRESSED AT THE CONFIRMATION HEARING.**

### 2.    Procedure for Objections

Any objection to approval of the Disclosure Statement or confirmation of the Plan must be filed with the Bankruptcy Court on or before <u>August 4, 2020</u> (the "Plan Objection Deadline") and served in a manner so that it is actually received on or before the Plan Objection Deadline by the following parties: (a) the Debtors, Thomas Health System, Inc., *et al.*, 4605 MacCorkle Ave SW, South Charleston, West Virginia, 25309, Attn: Aaron Alexander; (b) counsel to the Debtors, Whiteford, Taylor & Preston, L.L.P., 300 First Avenue, Floor 3, Pittsburgh, Pennsylvania, 15222, Attn: Michael J. Roeschenthaler (mroeschenthaler@wtplaw.com) and 10 S. Jefferson Street, Suite 1110, Roanoke, Virginia, 24011, Attn: Brandy M. Rapp (brapp@wtplaw.com); (c) the Office of the United States Trustee, 2025 Robert C. Byrd U.S. Courthouse, 300 Virginia Street, East Charleston, West Virginia, 25301, Attn: Gary O. Kinder (gary.o.kinder@usdoj.gov); (d) counsel to UMB Bank, N.A., Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts, 02111, Attn: Ian Hammel (iahammel@mintz.com); (e) counsel to the Creditors Committee, Sills, Cummis & Gross, P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew H. Sherman (asherman@sillscummis.com); and (f) any other party that has filed a request for notices with the Court in the Chapter 11 Cases.

Additionally, all objections to the Disclosure Statement or confirmation of the Plan must: (a) be in writing; (b) comply with the Bankruptcy Rules; (c) state the name and address of the objecting party and the amount and nature of the Claim beneficially owned by such entity; (d) state with particularity the legal and factual basis for such objections, and, if practicable, a proposed modification to the Plan that would resolve such objections; and (e) be filed with the Bankruptcy Court with proof of service thereof and served upon the foregoing notice parties so as to be actually received by the Plan Objection Deadline.

### 3.    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all the requirements of section 1129 of the Bankruptcy Code. Among the requirements for confirmation are that the Plan be: (a) accepted by all impaired classes of Claims that are entitled to vote or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such Class; (b) feasible; and (c) in the "best interests" of Creditors impaired under the Plan that have not voted to accept the Plan. The Bankruptcy Court also must find that:

- the Plan has classified Claims in a permissible manner;

- the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

### 4.    Voting and Acceptance of the Plan

As a condition to confirmation of the Plan, the Bankruptcy Code requires each Class of Impaired Claims entitled to vote on the Plan to vote to accept the Plan. The Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) number of those claims in that class actually voting. Holders of Claims who fail to vote will not be counted as either accepting or rejecting the Plan. A vote, moreover, may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that it was not made or solicited in good faith.

Classes of Claims that are Unimpaired under the Plan are conclusively presumed to have accepted the Plan and, therefore, are not entitled to vote. Classes of Claims that receive no distribution under the Plan are conclusively presumed to have rejected the Plan and are not entitled to vote.

### 5.    Best Interests Test

The "best interests" of impaired creditors test requires that each Holder of a Claim that has not voted to accept the Plan and belongs to an Impaired Class receive or retain under the Plan property of a value that is not less than the value such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To determine what members of each Impaired Class of Claims would receive if the Debtors were liquidated, the Bankruptcy Court must determine the dollar amount that a liquidation of the Debtors' assets would generate in the context of a chapter 7 liquidation. The amount available for satisfaction of Claims would consist of the proceeds resulting from the liquidation, reduced by the Claims of Secured creditors to the extent of the value of their collateral, and the costs and expenses of the liquidation.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as <u>Exhibit B</u>, showing that the value of the distributions provided to Holders of Allowed Claims under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation. Specifically, the Liquidation Analysis calculates the percentage recovery that the members of each impaired Class of Claims would receive if the Debtors were liquidated under chapter 7. Because the estimated percentage recovery under the Plan available to Holders of Allowed Claims exceeds the estimated percentage recovery that would be available in a chapter 7 liquidation, the Plan satisfies the "best interests" test as to Impaired Classes 1, 4 and 5.

As set forth above, Debtors THSPP and TMH Services are not members of the Obligated Group. Debtor THSPP filed its Schedules in the Chapter 11 Cases on February 21, 2020 at Docket No. 271. Debtor TMH Services filed it Schedules in the Chapter 11 Cases on June 7, 2020 at Docket No. 719. The Debtors' Schedules contain a schedule of all assets and liabilities of the Debtors, including those liabilities that are secured by property of the Debtors. Creditors and

parties in interest can view the Schedules, and all documents filed with the Court in the Chapter 11 Cases, on the Court's website, www.wvsb.uscourts.gov. Note that a PACER password is needed to access documents on the Court's website (a PACER password may be obtained by accessing the PACER website, http://www.pacer.gov). Documents are also available to be viewed at www.omniagentsolutions.com/ThomasHealthSystem, which is a case-specific website maintained by the Debtors' notice, claims and balloting agent, Omni Management Group. **No password or fee is associated with accessing the Omni website**.

> **6.      The Feasibility Test**

The "feasibility" test requires the Bankruptcy Court to find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further reorganization of the Debtors. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared certain unaudited pro forma financial statements with regard to the Reorganized Debtors (the "Financial Projections"), which projections and the assumptions upon which they are based are attached hereto as Exhibit C. The Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

> **7.      The Fair and Equitable Test**

If any Impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan despite such non-acceptance under the "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code. To obtain a confirmation under those circumstances, the Debtors must show, among other things, that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to each impaired Class of Claims that has rejected the Plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" to a class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each holder of a claim included in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and equity interest, that the holder of any claim or equity interest that is junior to the claims or equity interest of such class will not receive or retain on account of such junior claim or equity interest any property at all unless the senior class is paid in full. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class and if no class receives more than it is entitled to receive on account of its claim or interest.

THE DEBTORS WILL SEEK CONFIRMATION OF THE PLAN UNDER THE "CRAM DOWN" PROVISIONS OF SECTION 1129(b) IF LESS THAN THE REQUISITE AMOUNT OR NUMBER OF CLAIMS IN ANY ONE OR MORE CLASSES VOTE TO ACCEPT THE PLAN.

The Debtors believe that the Plan and the treatment of all Classes of Claims under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

      (a)    <u>No Unfair Discrimination</u>. The "unfair discrimination" test applies with respect to classes of claim that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

      With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. Accordingly, the Debtors believe that the Plan meets the standard to demonstrate that the Plan does not unfairly discriminate and the Debtors will be prepared to meet their burden to establish that there is no unfair discrimination as part of Confirmation of the Plan.

      (b)    <u>Fair and Equitable Test</u>. The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100% recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100% recovery or agreed to receive a different treatment under the Plan.

## 8.      Other Requirements of Section 1129

The Debtors believe that the Plan meets all the other technical requirements of section 1129 of the Bankruptcy Code, including that the Plan has been proposed in good faith.

## E.  Classification of Claims and Their Treatment Under the Plan

### 1.     Classification of Claims

Section 1122 of the Bankruptcy Code requires the Plan to place a Claim in a particular Class only if such Claim is substantially similar to the other Claims in that Class. The Debtors believe the Plan's classifications place substantially similar Claims in the same Class and thus meet the requirements of section 1122 of the Bankruptcy Code.

The Plan classifies Claims into five (5) Classes: Class 1 - Series 2008 Secured Bond Claims; Class 2 - Other Secured Claims; Class 3 - Other Priority Claims; Class 4 - Convenience Claims; and Class 5 - General Unsecured Claims. For each Class, the Plan states whether the Claims are Impaired and how the Holders of the Claims will be treated under the Plan. The Classes and proposed treatment of Allowed Claims of each Class under the Plan are summarized and described below. After Confirmation, and upon the occurrence of the Effective Date, the Plan binds the Debtors and all Creditors, whether or not those Creditors have accepted the Plan.

## 2.    Unclassified Claims

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Claims of a kind specified in sections 507(a)(2) or (8) of the Bankruptcy Code are not to be designated in a class. Thus, Administrative Expense Claims and Priority Tax Claims against the Debtors, as well as statutory fees under 28 U.S.C. § 1930, are treated separately under the Plan as unclassified Claims. The Plan provides the following treatment for such Claims:

(a)    <u>Administrative Claims</u>. Unless otherwise agreed to by the Holders of an Allowed Administrative Claim and the Debtors, or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed as of the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their businesses after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

<u>Bar Date for Administrative Claims</u>. PROOFS OF ADMINISTRATIVE CLAIMS AND REQUESTS FOR PAYMENT OF ADMINISTRATIVE CLAIMS THAT HAVE ARISEN ON OR AFTER THE PETITION DATE MUST BE FILED AND SERVED PURSUANT TO THE PROCEDURES SET FORTH IN THE CONFIRMATION ORDER NO LATER THAN THIRTY (30) DAYS AFTER THE EFFECTIVE DATE. Notwithstanding anything to the contrary in the Plan, no proof of Administrative Claim or application for payment of an Administrative Claim need be Filed for the allowance of any: (i) Administrative Claims held by trade vendors or others, which administrative liability was incurred by the Debtors in the ordinary course of business of the Debtors and such creditors after the Petition Date, subject, however, to the right of the Debtors to object to such Claims in the event of a bona fide dispute; (ii) Professional Fee Claims; or (iii) Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code. All Claims described in clauses (i) and (iii) of the immediately

preceding sentence shall be paid by the Debtors in the ordinary course of business. Professional Fee Claims shall be paid in accordance with subsection (b) below.

**Any Persons that fail to File a proof of Administrative Claim or request for payment thereof on or before the Administrative Claim Bar Date as required in the Plan shall be forever barred from asserting such Claim against any of the Debtors, the Estates, or their property, and the holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset or recover such Administrative Claim.**

(b)    Professional Fee Claims. All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed by the date that is not later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Reorganized Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals when such Professional Fee Claims are Allowed by entry of a Final Order of the Bankruptcy Court.

(c)    Priority Tax Claims. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**3.    Classified Claims**

The following describes the Plan's classification of those Claims against the Debtors required to be classified under the Bankruptcy Code. This information is provided in summary form below for illustrative purposes only and is qualified in its entirety by reference to the provisions of the Plan.

(a) Series 2008 Secured Bond Claims (Class 1)

(i)  Classification: Class 1 consists of the Series 2008 Secured Bond Claims including any Diminution Claims.

(ii) Treatment: In accordance with the Global 9019 Settlement, in full and final satisfaction, settlement, release and discharge of the Series 2008 Secured Bond Claims, the Series 2008 Secured Bond Claims shall be Allowed in the amount of $58,238,380 and the Bond Trustee shall receive without setoff, recoupment, subordination or reduction the Series 2008 Bond Payment in Cash from the Reorganized Debtors on the Effective Date, plus the Indenture Funds.

(iii)The Bond Trustee shall apply the Series 2008 Bond Payment [and Indenture Funds] in accordance with the terms of the 2008 Bond Documents.

(iv) Voting: Class 1 is Impaired under the Plan. Holders of Series 2008 Secured Bond Claims are entitled to vote to accept or reject the Plan. Pursuant to section 1126(c) of the Bankruptcy Code, Class 1 will be deemed to have accepted the Plan if it is accepted by at least two-thirds in amount and one-half in number of the Allowed Series 2008 Secured Bond Claims in Class 1 that have voted on the Plan.

(b) <u>Other Secured Claims (Class 2)</u>

(i) Classification: Class 2 consists of Other Secured Claims against all Debtors.

(ii) Treatment: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release and discharge of the Other Secured Claims, on or as soon as reasonably practicable after the later of: (i) the Effective Date and (ii) the date that is thirty (30) days after the date such Other Secured Claim is Allowed, each Allowed Other Secured Claim that has priority over the Series 2008 Bond Claims will be satisfied at the option of the Debtors by: (a) Cash in an amount equal to one hundred percent (100%) of the Allowed Other Secured Claim; (b) the return of the collateral subject to any senior, perfected and indefeasible lien or security interest; (c) recommencement of payment by the Reorganized Debtors of the monthly obligation due pursuant to the pre-existing contract/security agreement; or (d) such other treatment as the Debtors and such Holder of an Other Secured Claim may agree.

(iii) Voting: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

(c) <u>Other Priority Claims (Class 3)</u>

(i) Classification: Class 3 consists of any Other Priority Claims against all Debtors.

(ii) Treatment: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release and discharge of the Allowed Other Priority Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

a.  payment in full in Cash;

b.  deferred Cash payments of a value, as of the Distribution Date, equal to the Allowed Priority Claim; or

c.  such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(iii) Voting: Class 3 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

(d) <u>Convenience Claims (Class 4)</u>

(i)  Classification: Class 4 consists of Convenience Claims against all Debtors.

(ii) Treatment: On, or as reasonably practicable after, the later of (i) the Distribution Date and (ii) the date that is thirty (30) days after the date such Convenience Claim becomes an Allowed Convenience Claim, each Holder of an Allowed Convenience Claim shall receive in full and final satisfaction, settlement, release and discharge of such Allowed Convenience Claim, Cash in an amount equal to the lesser of (A) five hundred dollars ($500) and (B) the Allowed amount of such Holder's Convenience Claim; <u>provided</u>, <u>however</u>, that the total distribution to Holders of Allowed Convenience Claims under the Plan shall not exceed fifty thousand dollars ($50,000) (the "Convenience Class Cap"), and if the foregoing treatment would result in distributions to Holders of Allowed Convenience Claims that exceed the Convenience Class Cap in the aggregate, each Holder of an Allowed Convenience Claim will instead receive a Pro Rata Share of fifty thousand dollars ($50,000), with the amount of each such Holder's Convenience Claim fixed at the lesser of (x) five hundred dollars ($500) and (y) the Allowed amount of such Holder's Convenience Claim for the purpose of determining its Pro Rata Share.

(iii) Election of Treatment: Any Holder of an Allowed General Unsecured Claim whose Claim is equal to or less than $1,000 shall receive the treatment specified in Article III.D(4)(c) of the Plan. Any Holder of an Allowed General Unsecured Claim whose Allowed Claim is more than $1,000, and who timely elects to reduce the amount of such Claim to $1,000 in accordance with the terms of section III.D.4 of the Plan, also shall receive treatment of its Allowed General Unsecured Claim as a Convenience Claim, as so reduced, as specified in the Plan. Election of treatment in Class 4 must be made on such Holder's ballot for voting on the Plan and be received by the Debtors on or prior to the Voting Deadline. Any election of treatment in Class 4 made after the Voting Deadline shall not be binding upon the Debtors or the Reorganized Debtors unless such deadline is expressly waived, in writing, by the Debtors or the Reorganized Debtors. The Holder of an Allowed General Unsecured Claim that timely elects to reduce the amount of its Allowed Claim shall be deemed to be the Holder of an Allowed Convenience Claim for classification, voting and all other purposes under the Plan.

(iv) Waiver: Any Holder of an Allowed General Unsecured Claim that timely elects to reduce the amount of its Allowed Claim and to receive treatment as an Allowed Convenience Claim shall be deemed to have released the Debtors, their Estates, the Reorganized Debtors, and their respective property from any and all liability for such excess amount.

(v) Voting: Class 4 is Impaired under the Plan. Holders of Allowed Convenience Claims are entitled to vote to accept or reject the Plan. Pursuant to section 1126(c) of the Bankruptcy Code, Class 4 will be deemed to have accepted the Plan if it is accepted by at least two-thirds in amount and one-half in number of the Allowed Claims in Class 4 that have voted on the Plan.

(e) <u>General Unsecured Claims (Class 5)</u>

(i) Classification: Class 5 consists of all General Unsecured Claims against all Debtors, including, without limitation, Trade Claims and the General Unsecured Claims of the PBGC.

(ii) Treatment: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, including as set forth below with respect to the Bond Deficiency Claims, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, release and discharge of its Allowed General Unsecured Claim, a Pro Rata Share of the $7,000,001 GUC Distribution, on or as soon as reasonably practicable after the later of: (i) thirty (30) days after the Effective Date or (ii) the date that is thirty (30) days after the date such General Unsecured Claim is Allowed.

(iii) Global 9019 Settlement: As part of the Global 9019 Settlement, the Bond Trustee shall receive $1.00 on account of all Allowed Bond Deficiency Claims in full and final settlement of all such Allowed Bond Deficiency Claims, with the remaining $7,000,000 of the GUC Distribution available exclusively for distribution to the Holders of Non-Deficiency General Unsecured Claims.

(iv) On or before the Effective Date, the Debtors shall deposit the GUC Distribution into the Segregated GUC Account.

(v) Voting: Class 5 is Impaired under the Plan. Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan. Pursuant to section 1126(c) of the Bankruptcy Code, Class 5 will be deemed to have accepted the Plan if it is accepted by at least two-thirds in amount and one-half in number of the Allowed Claims in Class 5 that have voted on the Plan. Holders of Allowed Bond Deficiency Claims are entitled to vote in Class 5 in the full amount of the Allowed Bond Deficiency Claims.

Any Class of Claims that does not have a Holder of an Allowed Claim or a Claim or temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### G. Means for Implementation of the Plan

#### 1. The Global 9019 Settlement

The Plan is centered around a comprehensive settlement and compromise among the Debtors, the Bond Trustee and the Creditors Committee regarding the Debtors' obligations associated with their senior secured indebtedness, the Series 2008 Bond Claims, the Challenge Rights, and the Challenge Litigation, which enables the Plan to become effective in these Chapter 11 Cases, ends the incurrence and expenditure of continuing administrative expenses of the Debtors, permits cash payments to be made to certain creditors, including Holders of Non-Deficiency General Unsecured Claims, on or about the Effective Date of the Plan and thereafter, and resolves the remaining litigation pending among the Creditors Committee, the Bond Trustee and all other parties named in the Challenge Litigation (the "Global 9019 Settlement"). The Global 9019 Settlement is comprised of (i) the classification and treatment of the Series 2008 Bond Claims specified in the Plan; (ii) the release and exculpation terms for the Bond Trustee, Bondholders, the Creditors Committee and its members, as specified in the Plan, including, without limitation, the Releasing Parties releasing the Released Claims; (iii) the compromise of the Bond Trustee's Diminution Claims; (iv) the Bond Trustee's agreement to support the Debtors' use of Cash to pay Allowed Administrative Claims, Professional Fee Claims, Priority Tax Claims, and Other Priority Claims; (v) the compromise of the Bond Deficiency Claims; (vi) the Debtors' use of Cash to provide liquidity to the Debtors' continued business on and after the Effective Date; (vii) funding of the GUC Distribution to pay Allowed General Unsecured Claims as specified in the Plan (with $7,000,000 of the GUC Distribution available exclusively for distribution to the Holders of Non-Deficiency General Unsecured Claims); (viii) the settlement and dismissal of the Challenge Litigation with prejudice as of the Effective Date, and (ix) the agreement by the Bond Trustee, the majority holders of the Series 2008 Bond Claims and the Creditors Committee to support confirmation of the Plan. The treatment and distributions provided for in the Plan with respect to the Class 1 and Class 5 Claims under the Global 9019 Settlement reflect a compromise and settlement of numerous complex issues including the scope, extent and value of the collateral associated with the Series 2008 Bonds, the valuation of the Bond Trustee's Diminution Claims, the extent and value of the assets of the Estates available for distribution to Holders of Allowed General Unsecured Claims, other issues raised in the Challenge Litigation, potential disputes and objections the Bond Trustee, the Creditors Committee and Debtors could litigate concerning the Debtors' ability to confirm a contested plan, and related matters. The Global 9019 Settlement provides final resolution of all issues relating to the rights and benefits of Holders of the Series 2008 Bond Claims, the Bond Trustee, the treatment of Allowed Class 5 Claims and the validity, enforceability and priority of the Series 2008 Bond Claims, including the Challenge Litigation, which shall be dismissed by the Creditors Committee with prejudice on the Effective Date.

The Plan shall constitute a motion to approve the Global 9019 Settlement. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the Global 9019 Settlement pursuant to Bankruptcy Rule 9019 (which is inclusive of the releases by the Debtors and their Estates against the Bond Trustee, Bondholders, the Creditors Committee and its members) and a finding by the Bankruptcy Court that the Global 9019 Settlement is in the best interest of the Debtors, their Estates and all Holders of Claims against the Estates. If the Effective Date does not occur, the Global 9019 Settlement shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

### 2.    Sources of Consideration

All Cash consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from Cash on hand of the Debtors or Reorganized Debtors as appropriate, including Cash derived from business operations, investments of the Debtors or Reorganized Debtors, rights and Claims held by the Debtors and Reorganized Debtors, the proceeds of the Series 2020 Bond issuance, and to the extent applicable, any interest the Debtors or Reorganized Debtors may have in the Self Insured Trust.

### 3.    Issuance of Series 2020 Bonds

(a)    On the Effective Date, the Reorganized Debtors will cause the Issuer to issue, subject to its authority and discretion, in accordance with the terms of the Plan, the Series 2020 Bonds in an aggregate principal amount of $60.1 million. Effective upon the issuance of the Series 2020 Bonds, and the disbursement to the Bond Trustee of the Series 2008 Bond Payment on account of the Series 2008 Secured Bond Claims on the Effective Date described in the Plan, any and all Bond Collateral associated with the Series 2008 Bonds other than the Series 2008 Bond Payment and the Indenture Funds shall be released and the Series 2020 Bonds shall be secured by a pledge of gross revenues of the Obligated Debtors, first lien mortgages on the real property owned by the Obligated Debtors, first lien leasehold mortgages on approximately 27 acres of real property leased by the Obligated Debtors, a collateral assignment of rights in ground leases (to the extent assignable) and substantially all other assets of the Obligated Debtors, all as more fully set forth in the 2020 Bond Documents and as described in the Plan Supplement; *provided, however*, that the Series 2020 Bonds shall not be secured by a lien on or security interest in any of the GUC Distribution, which GUC Distribution shall be deposited into the Segregated GUC Account free and clear of all Liens, claims and encumbrances in accordance with the Global 9019 Settlement. Proceeds of the Series 2020 Bonds shall be used to: provide a portion of the funds needed to refund the Series 2008 Bonds at a discount to par as specified in the Plan, fund a Debt Service Reserve Fund (described below), potentially fund an Operating Reserve Fund, and pay for costs relating to the issuance of Series 2020 Bonds. The Reorganized Debtors are required to have $43 million in unrestricted cash and investments (including board-designated funds) on the Effective Date (the "Bankruptcy Exit Cash Requirement"), none of which unrestricted cash and investments shall include the amounts in the Segregated GUC Account.

(b)    The issuance of the Series 2020 Bonds is required for the refunding, modification and discharge of the Claims and obligations arising from or relating to the Series 2008 Bonds and the 2008 Bond Documents. The Obligated Debtors have entered into the Rosemawr Term Sheet setting forth the terms and conditions of the 2020 Bond Documents under which the Series 2020 Bonds will be issued and purchased by Rosemawr, and the Series 2008 Bonds will be refunded and retired pursuant to the Plan.

(c)    The Series 2020 Bonds shall have a par amount of $60.1 million of tax exempt and taxable bonds. For the avoidance of doubt, the Series 2020 Bonds will be sold with original issue discount of 5.5% so that the proceeds of the Series 2020 Bonds will be less than the par amount of the Series 2020 Bonds. To the extent any amount of taxable bonds must be issued to meet the requirements of the Series 2020 Bond issuance, up to $5 million in taxable bonds may be issued at a 6.5% coupon with any taxable bonds in excess of $5 million carrying an interest rate that is 137% of the interest rate that is the longest maturity of the tax-exempt bonds. To the extent that any taxable bonds are issued, such taxable bonds will be the first to amortize.

(d)    The Reorganized Debtors shall cause the Issuer to issue the Series 2020 Bonds and loan the proceeds thereof to the Reorganized Debtors for the purposes set forth in the Plan, including, without limitation, the refunding and discharge of the Series 2008 Bonds. ionalThe Bond Deficiency Claims shall be discharged in accordance with the terms of the Global 9019 Settlement and the Plan. The discharges described herein will likewise result in the termination of the Series 2008 Notes and termination of the 2008 Bond Documents, except as otherwise provided in Article XII.D of the Plan. The actions taken pursuant to the Plan shall, with respect to the Debtors and the Reorganized Debtors, be deemed to effect a complete refunding and discharge of the Series 2008 Bonds under the terms of the 2008 Bond Documents with no further action required by the Debtors or Reorganized Debtors.

(e)    The Series 2020 Bonds will have a final maturity date of October 1, 2050; provided, however, that the Series 2020 Bonds are subject to redemption prior to maturity in whole or in part, beginning on October 1, 2030 and on any date thereafter, at a redemption price equal to par plus accrued interest to the redemption date of the Series 2020 Bonds. There shall be no optional redemption available prior to October 1, 2030 except that Rosemawr will allow up to $5 million of the Series 2020 Bonds to be issued under a separate CUSIP which will be redeemable at 100% of par at any time after the Effective Date and shall be the first bonds to amortize. Repayment to the holders of the Series 2020 Bonds shall commence after the date of issuance and be payable over the first 36 months as interest-only payments, with principal amortizing thereafter. Commencing on April 1, 2024, the Series 2020 Bonds shall be payable semiannually with principal based upon a 30-year amortization. The repayments by the Reorganized Debtors under the Loan Agreement will be made on a monthly basis to the trustee for the Series 2020 Bonds.

(f)    The 2020 Bond Documents executed and delivered by the relevant Reorganized Debtors in connection therewith shall require the relevant Reorganized Debtors to maintain a Debt Service Coverage Ratio ("DSCR") based on audited financial

statements and unless adjusted for special non-recurring charges as specified in the 2020 Bond Documents equal to at least 1.25x maximum annual debt service on the Series 2020 Bonds and any parity indebtedness. Parity indebtedness shall be considered any debt that has a parity lien on any of the collateral securing the Series 2020 Bonds. For avoidance of doubt, the estimated $5.3 million in outstanding secured loans of Debtor TMH Services and the estimated $5.3 million in outstanding capital equipment leases shall not be considered parity indebtedness and shall not be included in the DSCR calculation. Compliance with the DSCR covenant will be tested annually as part of the Reorganized Debtors' annual certification, beginning with the year ending September 30, 2022. For the avoidance of doubt, the DSCR still must be reported as part of the annual certification for fiscal years 2020 and 2021 even though the first testing date does not occur until fiscal year 2022. The DSCR will be reported semi-annually for the six months ending March 31 and the twelve months ending September 30 based on unaudited financial statements beginning with the quarter ending March 31, 2021. The DSCR shall be calculated on an annualized basis for the purposes of the semi-annual reporting using quarterly financial statements. Failure to maintain a DSCR of at least 1.00x on any testing date based on annual audited financial statements shall constitute an event of default. Failure to maintain a DSCR of at least 1.25x on any testing date based on annual audited financial statements shall require the Reorganized Debtors to retain an independent consultant to make recommendations to bring the Obligated Group into compliance. So long as the Reorganized Debtors make good faith efforts to implement all practicable recommendations, there shall be no event of default as long as the DSCR does not fall below 1.00x for any fiscal year. Additional terms regarding the Series 2020 Bonds and the 2020 Bond Documents shall be set forth in the Plan Supplement. To the extent of any conflict between the foregoing summary and the 2020 Bond Documents, the 2020 Bond Documents shall control.

## 4.    Retained Claims

The Retained Claims shall vest in the Reorganized Debtors on the Effective Date and the Reorganized Debtors shall be solely responsible for the continuation of any litigation or negotiation related thereto. Except to the extent expressly released under the Plan, nothing in these Chapter 11 Cases shall impact the Reorganized Debtors' ability to continue litigation related to the Retained Claims nor shall such retention be construed as granting a Creditor or Person with any right that is inconsistent with the other terms of the Plan.

The Debtors are in the process of reviewing the relief programs and protections available for healthcare providers and businesses generally related to COVID-19, including, without limitation, the availability to Relief Funds. For avoidance of doubt, to the extent the Debtors are entitled to assert a claim or exercise a right to Relief Funds, such rights are expressly preserved.

## 5.    Corporate Existence

Except as otherwise provided in the Plan or in the Corporate Governance Documents, the Reorganized Debtors shall continue to exist on and after the Effective Date as separate non-stock corporate entities with all the powers of non-stock corporations, pursuant to the applicable law in the jurisdiction in which Reorganized Debtors were incorporated or formed.

### 6. Reorganized Debtor Governance

The existing members of the Debtors' Boards of Directors shall, pursuant to their existing self-perpetuating nature, continue to be members of the Boards of Directors of the Reorganized Debtors. Additionally, the 2020 Bond Documents will require Thomas Health System, Inc. to appoint a special board of director position to be filled by a person chosen by the designated bondholder representative.

### 7. Officers of Reorganized Debtors

The existing officers of the Debtors shall continue to be officers of the Reorganized Debtors. Such officers shall serve in accordance with applicable non-bankruptcy law.

### 8. Employee Benefits

Except as otherwise provided in the Plan (including, without limitation, the Debtors' contemplated termination of Retirement Plan for Employees of Herbert J. Thomas Memorial Hospital), on and after the Effective Date, the Reorganized Debtor(s) may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs and plans for, among other things, compensation, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance and accidental death and dismemberment insurance for the directors, officers and employees of any of the Debtors who served in such capacity at any time during the Chapter 11 Cases and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date; provided, however, that the Debtors' or the Reorganized Debtor(s)' performance under any employment agreement will not entitle any Person to any benefit or alleged entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such policy, program or plan. Nothing in the Plan shall limit, diminish or otherwise alter the Reorganized Debtor(s)' or the Debtors' defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans.

### 9. Termination of Defined Benefit Pension Plans

The TMH Pension Plan will be terminated through an involuntary termination commenced by the PBGC under 4042 of ERISA. Upon termination of the TMH Pension Plan, any Claims arising from the termination will be paid in accordance with Article III of the Plan and the settlement terms set forth in Article IV, Section U of the Plan. Because the Debtors seek a reorganization in the Chapter 11 Cases, any termination premiums due to PBGC will not arise until after the Plan is confirmed and the Debtors obtain a discharge. Under these circumstances, the termination premiums are not a dischargeable claim or debt within the meaning of 11 U.S.C. §§ 101(5) and 1141 for the purpose of the Plan, and the Reorganized Debtors will be jointly and severally liable for the termination premiums. As detailed in Article VIII of the Plan, PBGC reserves its rights to pursue certain claims on behalf of the TMH Pension Plan and itself, subject to the rights of the Debtors under the Plan and applicable law. When the TMH Pension Plan is terminated and the PBGC becomes the statutory trustee of the TMH Pension Plan, PBGC will

pay benefits to the TMH Pension Plan's participants up to defined statutory limits. Following the PBGC's issuance of a notice of determination that the TMH Pension Plan is terminated, the Debtors and Reorganized Debtors shall reasonably cooperate with the PBGC to effectuate the termination of the TMH Pension Plan and transfer of the TMH Pension Plan assets and records. The Debtors and Reorganized Debtors shall securely maintain all records and documents related to the TMH Pension Plan or, if such records and documents are not in the Debtors' direct possession, shall use reasonable means to cause the preservation of such records and documents until such time as those records and documents are transferred to the PBGC, provided, however, that the PBGC makes reasonable efforts to take custody of the records and documents. Any Person, Governmental Unit, party-in-interest, actuary, or accountant shall timely respond to inquiries or requests by either the Reorganized Debtors or the PBGC to effectuate the transfer of the TMH Pension Plan assets and records to the PBGC or otherwise advance the administration of the TMH Pension Plan following its termination.

The Debtors or Reorganized Debtors are not terminating other retirement plan programs such as defined contribution plans, including, without limitation, any 401(k) program but likewise reserve all rights to do so or modify the same in an exercise of their reasonable business judgment.

### 10.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated herein, on the Effective Date and with respect to the Bond Trustee, upon receipt by the Bond Trustee of the Cash to be distributed to it on the Effective Date pursuant to the Plan, or as soon as practicable thereafter, all property of the Debtors' Estates and all Causes of Action shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens securing the Series 2020 Notes or Other Secured Claims; *provided, however*, that no Liens securing the Series 2020 Notes or Other Secured Claims shall attach to the Segregated GUC Account or the GUC Distribution therein). On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their business and may use, acquire or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided, however*, that the GUC Distribution is available exclusively for the distribution to Holders of Allowed Class 5 General Unsecured Claims pursuant to the terms set forth in Article III.D.5 herein.

### 11.    Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Persons may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the

terms of the Plan and having other terms for which the applicable Persons agree; (c) the filing of appropriate certificates or articles of incorporation or amendments thereof, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (d) all other actions that the applicable Persons and/or Reorganized Debtors determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

## 12. Corporate Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including all actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtors or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, operating agreements and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors or the Reorganized Debtors, as the case may be, and any and all other agreements, documents, securities and instruments relating to the foregoing.

## 13. Preservation of Causes of Action of the Debtors

Except as otherwise provided in the Plan (including as provided under the Global 9019 Settlement) or any agreement, instrument or other document incorporated in the Plan, in accordance with Bankruptcy Code section 1123(b), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Person, creditor, entity or party-in-interest may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors or the Reorganized Debtors have released any Person or Persons on or before the Effective Date, the Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, creditor, entity or party-in-interest, except as otherwise expressly provided in the Plan. Unless any Causes of Action against a Person, creditor, entity or party-in-interest are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or Consummation of the Plan.

### 14.    Waiver of Avoidance Actions

Notwithstanding anything to the contrary contained in the Plan, as of and subject to the occurrence of the Effective Date, the Debtors and the Reorganized Debtors, for and on behalf of themselves and their Estates, may and hereby elect to waive and release any and all Avoidance Actions which shall be deemed irrevocably waived and released as of the Effective Date.

The Debtors have not determined the value of the Avoidance Actions. However, the Debtors believe that the only material Avoidance Actions would be the potential claims they may hold against various general unsecured creditors and trade vendors for the avoidance of preferential transfers pursuant to section 547 of the Bankruptcy Code. Given the nature of these claims and the statutory defenses that may be asserted in connection thereto, it is not possible for the Debtors to accurately determine a value for such claims. Additional considerations for determining the value of such preference claims include, among other things, (i) the probability of success in the litigation; (ii) the complexity, expense and likely duration of the litigation; and (iii) potential difficulties in collection in the event the action is successful. Creditors can assess the Debtors' Schedules at the Debtors' claims agent website for information regarding transfers that could be subject to avoidance.

### 15.    Post-Effective Date Continuation of the Creditors Committee

The Creditors Committee shall not be dissolved upon the Effective Date. The Committee shall dissolve upon the earlier of: (i) the Bankruptcy Court's entry of final decrees closing the Chapter 11 Cases, or (ii) final distribution of the GUC Distribution. The Creditors Committee shall continue to be represented by Sills, Cummis & Gross P.C., Bailey & Wyant, PLLC, and Grant Thornton, LLP (the "Committee Professionals") until dissolution of the Creditors Committee as set forth above. The Committee Professionals' reasonable fees and expenses in connection with representation of the post-Effective Date Creditors Committee shall be paid by the Reorganized Debtors.

### 16.    *Other Settlements*

**Settlement with PBGC** – Upon consideration of the facts, circumstances and legal issues associated with the termination of the TMH Pension Plan, including the time and expense associated with a contested voluntary termination and litigating the resulting Claims, the Debtors and the PBGC have agreed to the following in full and final satisfaction of any and all Claims of the PBGC, which has asserted Administrative Claims, Priority Claims and Non Deficiency General Unsecured Claims.

(a)     The PBGC shall initiate an involuntary termination of the TMH Pension Plan under section 4042 of ERISA. The termination date shall be August 31, 2020.

(b)     Subject to the involuntary termination of the TMH Pension Plan, the PBGC shall have the following Allowed Claims:

(I)     An Allowed Administrative Claim in the amount of $175,000, which shall be paid by the Reorganized Debtors on the latter of thirty (30) days following: the involuntary termination of the TMH Pension Plan or the Plan Effective Date.

(II)     An Allowed Non Deficiency General Unsecured Claim of $74,000,000, which shall be paid in accordance with the Plan as an allowed Class 5 Claim.

(c)     The Reorganized Debtors shall pay to the PBGC the termination premiums of the TMH Pension Plan, as provided in 29 U.S.C. § 1306(a)(7) in the aggregate amount of $5,640,000 ("Termination Premiums"). The Termination Premiums shall be paid by the Reorganized Debtors (who are jointly and severally liable) in three (3) equal installments of $1,880,000. The first payment of $1,880,000 will be due thirty (30) days following the first twelve-month period after the termination date of the TMH Pension Plan (the "Initial Termination Premium Due Date"). The second payment of $1,880,000 shall be due twelve months after the Initial Termination Premium Due Date. The third payment of $1,880,000 shall be due twenty four months after the Initial Termination Premium Due Date. For the avoidance of doubt, the Termination Premiums are not a dischargeable claim or debt.

(d)     All other Claims asserted by the PBGC shall be withdrawn.

(e)     The PBGC shall vote its Allowed Non Deficiency General Unsecured Claim of $74,000,000 in favor of the Plan.

(f)     Subject to Article VIII of the Plan, no other party shall be responsible for payment of the Allowed Claims of the PBGC or Termination Premiums owned to PBGC.

## H. Treatment of Executory Contracts and Unexpired Leases

### 1.     Deemed Rejection of Certain Executory Contracts and Unexpired Leases

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed rejected by the Debtors in accordance with sections 365(a) and 1123(b)(2) of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that: (i) have been assumed or rejected by the Debtors by prior order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) are the subject of a motion to assume filed by the Debtors pending on the Effective Date; (iv) are identified by the Debtors for assumption in the Plan Supplement, which may be amended by the Debtors to add or remove Executory Contracts and Unexpired Leases prior to the Effective Date; or (v) are assumed by the Debtors pursuant to the terms of the Plan.

The Confirmation Order shall constitute an order of the Bankruptcy Court  under sections 365 and 1123(b) of the Bankruptcy Code  approving the assumptions or rejections, as applicable, of such Executory Contracts or Unexpired Leases, as of the Effective Date. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases in the Plan will be effective as of the Effective Date.

Notwithstanding the foregoing paragraph or anything contrary herein, the Debtors reserve their rights to alter, amend, modify or supplement the Executory Contracts and Unexpired Leases identified in the Plan Supplement prior to the Effective Date.

### 2.    Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases

Any defaults under each Executory Contract and Unexpired Lease to be assumed, or assumed and assigned, pursuant to the Plan shall be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable default amount in Cash on the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree in writing (the "Cure Claim Amount").

In the event of an assumption, or an assumption and assignment, of an Executory Contract or Unexpired Lease under the Plan, the Debtors shall file, as part of the Plan Supplement, and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, or proposed assumption and assignment (the "Assumption Notice"), which will: (a) list the applicable Cure Claim Amount, if any; (b) if applicable, identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court, including the date by which any objection to the Assumption Notice must be filed by the counterparty and received by the Debtors.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, or proposed assumption and assignment under the Plan, or any related cure amount, must be filed, served and actually received by the Debtors on the date specified in the Assumption Notice (notwithstanding anything in the Schedules or a Proof of Claim to the contrary). Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or Cure Claim Amount will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and cure amount. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving each proposed assumption, or proposed assumption and assignment, of such Executory Contracts or Unexpired Leases as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption or assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving such assumption or assumption and assignment; provided, however, that following the resolution of any such dispute, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assigning it. The Debtors or the Reorganized Debtors, as applicable, shall be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

3.      **Claims on Account of the Rejection of Executory Contracts or Unexpired Leases**

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within twenty-one (21) days after the Effective Date; provided, however, that to the extent any Executory Contract or Unexpired Lease is rejected pursuant to a Final Order, any Proof of Claim with respect to Claims arising from the rejection of an Executory Contract or Unexpired Lease authorized by such Final Order must be filed with the Bankruptcy Court within twenty-one (21) days of the entry of the Final Order approving such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

4.      **Assumption of the Medicare and/or Medicaid Provider and Supplier Agreements**

The Plan provides for the assumption and cure of each of the operating Debtors' Medicare and/or Medicaid Provider and Supplier Agreements on the Effective Date, providing that all issues regarding the Debtors' cure of any defaults under their respective Medicare and/or Medicaid Provider and Supplier Agreements on the Confirmation Date are addressed to the satisfaction of CMS, West Virginia, and any other applicable Governmental Unit, pursuant to the special assumption provisions set forth in V.D of the Plan.

**I.   Provisions Governing Distributions**

1.      **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in the "Treatment" sections in Article III of the Plan or as ordered by the Bankruptcy Court, initial distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Distribution Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Distributions on account of Disputed Claims that first become Allowed Claims after the Effective Date shall be made pursuant to Article VII of the Plan.

2.      **No Postpetition Interest on Claims**

Unless otherwise specifically provided for in the Plan, the Confirmation Order or Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including, without

limitation, as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

### 3.    Delivery and Distributions; Undeliverable or Unclaimed Distributions

(a)    <u>Record Date for Distributions</u>. On the Distribution Record Date, the Claims Register shall be closed. Accordingly, the Debtors, the Reorganized Debtors or other Disbursing Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes in the Plan to recognize and distribute property, notices and other documents only to those Holders of Allowed Claims who are Holders of such Claims as of the close of business on the Distribution Record Date. The Reorganized Debtors or other Disbursing Agent shall be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Claims Register, or their books and records, as of the close of business on the Distribution Record Date. Notwithstanding any other term of the Plan, the Reorganized Debtors or other Disbursing Agent shall treat the Bond Trustee as the record holder with respect to any distributions made under the Plan for Series 2008 Bond Claims.

(b)    <u>Delivery of Distributions in General</u>. Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; <u>provided</u>, <u>however</u>, that the manner of such distributions shall be determined in the discretion of the Disbursing Agent; <u>provided</u>, <u>further</u>, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in the latest Proof of Claim filed by such Holder pursuant to Bankruptcy Rule 3001 as of the Distribution Record Date. Notwithstanding the foregoing, distributions made on account of Allowed Claims relating to the Series 2008 Bonds shall be made to the Bond Trustee by wire transfer pursuant to instructions provided by the Bond Trustee.

(c)    <u>Minimum Distributions</u>. Notwithstanding anything in the Plan to the contrary, the Disbursing Agent shall not be required to make distributions or payments of less than $25.00 (whether in Cash or otherwise) or to make partial distributions or payments of fractions of dollars, in each case with respect to Impaired Claims. With respect to Impaired Claims, whenever any payment or distribution of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or more being rounded up to the next higher whole number and with less than half dollars being rounded down to the next lower whole number.

(d)    <u>Undeliverable Distributions.</u>

(i)    <u>Holding of Certain Undeliverable Distributions</u>. If the distribution to any Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be

made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then current address in accordance with the time frames described in Article VI.D.4(b) of the Plan, at which time all currently due but missed distributions shall be made to such Holder on the next subsequent Distribution Date (or such earlier date as determined by the Disbursing Agent).

(ii)  <u>Failure to Claim Undeliverable Distributions</u>. Any Holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to the Plan for an undeliverable or unclaimed distribution within ninety (90) days after the later of the Effective Date or the date such distribution is due shall be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such rights for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Debtors or their respective assets or property, or any Disbursing Agent.

(iii)  <u>Failure to Present Checks</u>. Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within ninety (90) days after the date of mailing or other delivery of such check shall have its rights for such un-negotiated check discharged and be forever barred, estopped and enjoined from asserting any such right against the Debtors, their Estates, the Reorganized Debtors, or their respective assets or property.

**4.      Compliance with Tax Requirements**

In connection with the Plan and all distributions under the Plan, the Disbursing Agent shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under the Plan shall be subject to any such withholding and reporting requirements. The Disbursing Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. The Debtors have determined that no withholding shall be required with respect to payments to the Bond trustee under the Plan.

**5.      Timing and Calculation of Amounts to Be Distributed**

Except as otherwise provided in the "Treatment" sections in Article III of the Plan or as ordered by the Bankruptcy Court, on the Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the subsequent Distribution Date occurring after such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an

Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable Class treatment or in Article VII of the Plan.

### 6.   Setoffs

Without altering or limiting any of the rights and remedies of the Debtors and the Reorganized Debtors under section 502(d) of the Bankruptcy Code, all of which rights and remedies are hereby reserved, and except with respect to the Series 2008 Bond Claims, the Debtors and the Reorganized Debtors may, but shall not be required to, withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, Causes of Action and Retained Claims of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim and that are not otherwise released herein; provided that, at least ten (10) days prior to effectuating such withholding, the Debtors or the Reorganized Debtors, as applicable, shall provide written notice thereof to the applicable Holder of such Claim, and all objections and defenses of such Holder to such withholding are preserved. In the event that any such claims, Causes of Action or Retained Claims are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors and the Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Retained Claims. Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, Causes of Action or Retained Claims, all of which are reserved unless expressly released or compromised pursuant to the Plan or the Confirmation Order.

### J.   Claims Paid or Payable by Third Parties

### 1.   Claims Paid by Third Parties

Except for distributions from persons or sources otherwise expressly contemplated by the Plan (including as provided in the Plan with respect to the Global 9019 Settlement), a Claim shall be reduced, and such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. To the extent that a Holder of a Claim other than a General Unsecured Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. To the extent that a Holder of a General Unsecured Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor (including any payment from the Self Insured

Trust) on account of such Claim, such Holder shall repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor who shall return such funds to the Segregated GUC Account to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount to be paid pursuant to the Plan on account of such Claim as of the date of any such distribution under the Plan.

**2.      Claims Payable by Third Parties**

The availability, if any, of Insurance Policy proceeds for the satisfaction of an Allowed Claim shall be determined by the terms of the Insurance Policies of the Debtors or Reorganized Debtors, as applicable. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim, then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the claims agent without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**3.      Applicability of Insurance Policies**

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any Insurance Policies, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**4.      Allowed Tort Claims**

The availability, if any, of funds from the Self Insured Trust for the satisfaction of Allowed Tort Claims shall be determined by the Bankruptcy Court. To the extent that funds from the Self Insured Trust result in the satisfaction or reduction of an Allowed Tort Claim, such Allowed Tort Claim may be reduced or expunged to the extent of any satisfaction on the Claims Register by the claims agent without a Claim objection having to be filed and without any further notice. The Debtors and Reorganized Debtors residual interest in the Self Insured Trust is subject to disputes presently before the Bankruptcy Court, and their interests in such funds if any, is expressly preserved. Any interests the Debtors or Reorganized Debtors may have in the Self Insured Trust will be utilized by the Reorganized Debtors to make payments or distributions pursuant to the Plan.

**5.      Limited Preservation of Allowed Tort Claims that are Granted Relief from the Automatic Stay**

To the extent the Holder of an Allowed Tort Claim has been granted relief from the automatic stay imposed under section 362(a) of the Bankruptcy Code (collectively, the "Stay Claimants") to prosecute and liquidate its claims, if any, against the Debtors, the Allowed Tort Claims of Stay Claimants shall not be discharged pursuant to the Plan *solely to the extent that Stay Claimants seek recovery from applicable insurance proceeds, and/or insurers and not the Debtors, the Debtors' Estates, or the Reorganized Debtors*. No collection or enforcement action may be asserted, continued or realized against the Debtors or the Reorganized Debtors, for any

Claims incurred or arising prior to the Effective Date; provided, however that Stay Claimants may proceed nominally against the Debtors in order to liquidate such Tort Claims. Additionally, no collection or enforcement action may be asserted, continued or realized against the property of the Debtors' Estates (including the GUC Distribution), or any successor or assign of the Debtors. The Stay Claimants shall not directly or indirectly (a) seek to compel any of the Debtors or Reorganized Debtors to pay any deductible, any self-insured retention, or any other amount for or on account of any insurance carrier, provider, broker or Insurance Policy or (b) obtain any distribution from the Debtors' Estates (including the GUC Distribution). Nothing in the Plan shall require the Debtors to satisfy any obligation with respect to any self-insured retention, deductible or similar cost or amount, or to pay or fund any expenses, including defense costs, with respect to the Allowed Tort Claims or the Stay Claimants. Nothing herein is intended to, or shall (i) alter, modify or otherwise amend the terms and conditions of, or the coverage provided by, any Insurance Policies issued at any time to any of the Debtors or of any agreements related thereto; (ii) alter or modify the duty, if any, that any applicable insurer or third party administrator (each, an "Insurer" and together, the "Insurers") has to pay claims covered by any alleged applicable Insurance Policy; (iii) is intended to create or enlarge, or restrict or diminish, any right of action of the Stay Claimants against any Insurers; (iv) alter or amend the rights of any Insurer with respect to any deductibles or self-insured retention under any applicable Insurance Policy; or (v) preclude or limit, in any way, the rights of any Insurer to contest and/or litigate the existence, primacy and/or scope of available coverage under any applicable Insurance Policy. Nothing herein is intended, or shall operate as a waiver or modification of the discharge injunction set forth in Article VIII, so as to permit the prosecution against the Debtors or Reorganized Debtors of any Claim, by any Person other than the Stay Claimants as provided herein.

### K. Procedures for Resolving Contingent, Unliquidated and Disputed Claims

### 1.    Resolution of Disputed Claims

(a)    Allowance of Claims. After the Effective Date, and except as otherwise provided in the Plan, the Reorganized Debtors shall have and shall retain any and all available rights and defenses that the Debtors had with respect to any Claim that is not an Allowed Claim, including, without limitation, the right to assert any objection to Claims based on the limitations imposed by section 502 or section 510 of the Bankruptcy Code. For the avoidance of doubt, Article VII of the Plan shall not apply to the Series 2008 Bond Claims.

(b)    Prosecution of Objections to Claims. Except as otherwise provided in this Section, after the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors shall have the authority to file objections to Claims (other than those that are Allowed under the Plan) and settle, compromise, withdraw or litigate to judgment objections to any and all such Claims, regardless of whether such Claims are in an Unimpaired Class or otherwise; provided, however, that the Reorganized Debtors and Creditors Committee shall comply with the following process commencing on the Effective Date:

The Reorganized Debtors shall obtain the consent of the Committee, which consent shall not be unreasonably withheld, regarding any allowance of, objection to or settlement of any asserted pre-petition Claim equal to or greater than $40,000 (excluding any Claim of a Creditors Committee member for which no consent right is required).

1. If the Creditors Committee does not consent to the Reorganized Debtors' allowance of, objection to or settlement of any asserted pre-petition Claim equal to or greater than $40,000 (excluding any Claim of a Creditors Committee member), the Reorganized Debtors may pursue such allowance, objection or settlement on notice and an opportunity for a hearing. All rights of the Creditors Committee to be heard in connection with any such relief are reserved and preserved.

2. In the event that, after consultation with the Creditors Committee, the Reorganized Debtors refuse to prosecute an objection of an asserted pre-petition Claim equal to or greater than $40,000 (excluding any Claim of a Creditors Committee member), the Creditors Committee may object to, prosecute and/or settle any such pre-petition Claim on notice and an opportunity for a hearing, provided that any settlement does not exceed the face amount of the asserted pre-petition Claim. All rights of the Reorganized Debtors to be heard in connection with any such relief are reserved and preserved.

3. Both the Reorganized Debtors and the Creditors Committee agree to take into consideration the costs associated with prosecuting a Claim objection when considering the reasonableness of allowance, objections and settlements. The Reorganized Debtors reserve the right to object to the payment of fees associated with objecting to or otherwise disposing of Claims and/or Disputed Claims where the cost associated with such action exceeds the amount of the distribution that would have been paid on account of such Claim had the action never been taken.

4. With respect to its rights under Article VII.A.2.c, the Creditors Committee is hereby granted standing and authority to object to, prosecute, settle, and/or otherwise be heard in connection with Claims.

5. Subject to and in accordance with the foregoing, the Reorganized Debtors may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court. The Reorganized Debtors shall have the sole authority to administer and adjust the Claims Register and their respective books and records to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

6. The Bankruptcy Court shall have the right to determine if either the Reorganized Debtor or the Creditors Committee is reasonably exercising their respective rights in this Plan Section.

This provision of the Plan shall not apply to Professional Fee Claims, which may be objected to by any party-in-interest in these Chapter 11 Cases.

(c)     Claims Estimation. After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim or contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, whether for allowance or to determine the maximum amount of such Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.

(d)     Deadline to File Objections to Claims. Any objections to Claims shall be filed by no later than the Claims Objection Deadline; provided that nothing contained herein shall limit the Reorganized Debtors' right (or Creditors Committees' right, as applicable) to object to Claims, if any, filed or amended after the Claims Objection Deadline. The Claims Objection Deadline may be extended by the Bankruptcy Court upon motion by the Debtors or the Reorganized Debtors without notice or a hearing. Bankruptcy Rule 9006 shall apply to any motion to extend the Claims Objection Deadline. Moreover, notwithstanding the expiration of such objection deadline, the Debtors or the Reorganized Debtors (and the Creditors Committee, as applicable) shall continue to have the right to amend any claims objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed.

**2.     No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim is or becomes Allowed by Final Order.

**3.     Distributions After Allowance of Claim**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.

**L.  Discharge, Settlement Release Injunction and Related Provisions**

**1.     Discharge of Claims**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (not including any Debtor Intercompany Claims or non-Debtor Intercompany Claims) and Causes of

Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims relate to the loss of tax-exemption of any portion of the Series 2008 Bonds that arise as a result of the Plan or after the Effective Date for periods prior to the Effective Date, or relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, benefit, or pension plan, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim based upon such debt, or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim has accepted the Plan or voted to reject the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan.

## 2.      Compromise and Settlement of Claims, Interests and Controversies

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan shall constitute a good faith compromise of all Claims and controversies relating to the contractual, legal, and equitable rights (including, without limitation, subordination rights) that a holder of a Claim may have with respect to any Allowed Claim, or any distribution to be made on account of such Allowed Claim. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor(s) may compromise and settle Claims against them and Causes of Action against other Persons, Entities, Governmental Units or other parties-in-interest.

## 3.      Releases by the Debtors, Reorganized Debtors, their Affiliates and their Estates

Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in the Plan, the Plan Supplement, or the Confirmation Order, for good and valuable consideration, including the service of the Debtor Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, and to the fullest extent permitted by applicable law, in exchange for their cooperation, on and after the Effective Date, the Debtor Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtor(s), their Affiliates and the Estates from any and all claims, obligations, rights, suits,

damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtor(s), the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or other Person or Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Series 2008 Bonds, the Debtors' Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan, the business or contractual arrangements between any Debtor and any Debtor Released Party, the restructuring, sale, or refinancing efforts of the Debtors, the restructuring of Claims before or during the Debtors' Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents (collectively, the "Debtor Released Claims"). For the avoidance of doubt, the Debtor Released Claims shall not operate to waive, release, or otherwise impair: (i) any Causes of Action arising from willful misconduct, actual fraud or gross negligence of such applicable Debtor Released Party as determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction; or (ii) the rights of such Debtors or the Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court. For the avoidance of doubt, the releases described in the Plan are an integral component of the Global 9019 Settlement as they relate to the Bond Trustee, the Bondholders and the Creditors Committee and shall, on the Effective Date, provide a full release of any claim, Cause of Action or challenge, including, but not limited to claims relating to the Series 2008 Bonds or 2008 Bond Documents including all matters asserted in the Challenge Litigation.

**4.      Releases by Holders of Claims**

**As of the Effective Date and except as set forth in the Plan, the Plan Supplement, or the Confirmation Order, each Holder of a Claim shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including, but not limited to any derivative Claims assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Person or Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Series 2008 Bonds, the Debtors' restructuring sale, financing, and/or refinancing efforts, the Debtors' Chapter 11 Cases, the Reorganized Debtor(s) or the Issuer, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents (collectively, "Released Claims"); provided, however, that except as otherwise expressly provided, the Plan shall not release the Debtors, the Reorganized Debtor(s) and the Released Parties from any Cause of Action held by a Governmental Unit existing as of the Effective Date based on (i) the Internal**

Revenue Code of 1986, as amended, or other domestic state, city, or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the Securities and Exchange Act of 1934 (as now in effect or hereafter amended), the Securities Act of 1933 (as now in effect or hereafter amended), or other securities laws of the United States or any domestic state, city or municipality, or (v) ERISA, nor shall the Plan release the Debtors or Reorganized Debtors from any obligation to perform their obligations under the Plan. For the avoidance of doubt, the Released Claims shall not operate to waive, release, or otherwise impair: (i) any Causes of Action arising from willful misconduct, actual fraud or gross negligence of such applicable Released Party as determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

(a) PBGC Release - As of the Effective Date, to the maximum extent permitted by applicable law, other than the Allowed Claims of the PBGC delineated in Section U of Article IV of the Plan, which shall be paid in strict accordance with the Plan by only the Reorganized Debtors, and the Termination Premiums delineated in Section U of Article IV of the Plan, which shall be paid by only the Reorganized Debtors, (i) the Foundation and the Debtors for which the Plan is confirmed, and the Estates for any Debtors for which the Plan is confirmed, and (ii) solely in their capacity as acting by, through, or in any way on behalf of the entity listed in the immediately foregoing clause, the Debtors' and Foundations' professionals, employees, officers, directors, board members, attorneys, and financial advisors as well as the Released Parties, for good and valuable consideration, shall be deemed to be absolutely, unconditionally, and irrevocably released and forever discharged by PBGC and the TMH Pension Plan from any Causes of Action based on or relating to any PBGC plan termination and any Claims arising therefrom. For the avoidance of doubt, the Reorganized Debtors are not discharged, released or exculpated from the Termination Premiums stated in Section U of Article IV of the Plan. Notwithstanding the foregoing, or any provision in the Plan, Disclosure Statement or Confirmation Order, or any other document filed in the Debtors' Chapter 11 Cases, including but not limited to the discharge, releases, exculpations, settlements and injunctions set forth in Article VIII of the Plan, nothing shall be construed to release, discharge or exculpate any individual or entity from fiduciary breach related to the TMH Pension Plan or enjoin or prevent the TMH Pension Plan or PBGC from collecting any such liability from a liable individual or entity.

5.    Release of Liens

Except as otherwise provided in the Plan, including but not limited to, Other Secured Claims that are Reinstated pursuant to the Plan, obligations pursuant to Executory Contracts and Unexpired Leases assumed pursuant to the Plan, and the Series 2020 Bonds, or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security

interests shall revert to the Reorganized Debtor(s) and its or their successors and assigns. For the avoidance of doubt, except as otherwise provided in the Plan, including Article III.D of the Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

6.    **Exculpation**

**Effective as of the Effective Date, to the fullest extent permissible under applicable law, except as otherwise specifically provided in the Plan or Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, administration, implementation, or filing of, as applicable, the Disclosure Statement, the Plan, the Plan Supplement, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence. Notwithstanding anything to the contrary in the Plan the Exculpated Parties shall, in all respects, be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. With respect to any Exculpated Party that is not also an Estate fiduciary, such exculpation shall be provided for by section 1125(e) of the Bankruptcy Code.**

7.    **Injunction**

**FROM AND AFTER THE EFFECTIVE DATE, PURSUANT TO SECTION 524(a) OF THE BANKRUPTCY CODE, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AND EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN, OR THE CONFIRMATION ORDER, ALL PERSONS AND ENTITIES THAT HAVE, HOLD, OR MAY HOLD CLAIMS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO THE EXCULPATION RESTRICTIONS BELOW ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE**

**DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE RELEASED PARTIES:** FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THE PLAN, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT, THE CONFIRMATION ORDER OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS AND ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE RELEASED PARTIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE RELEASED PARTIES OR THEIR ASSETS OR PROPERTY ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS IN THE PLAN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE RELEASED PARTIES OR ANY OF THEIR ASSETS OR PROPERTY. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE RELEASED PARTIES SHALL BE FULLY RELEASED AND DISCHARGED (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN).

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN, THE CONFIRMATION ORDER, OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE RELEASED

PARTIES SHALL BE FULLY RELEASED AND DISCHARGED AND THE RELEASED PARTIES' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE RELEASED PARTIES, THEIR REPRESENTATIVES, AND EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

FOR THE AVOIDANCE OF DOUBT, NOTHING IN THE PLAN SHALL IMPAIR THE RIGHTS OF ANY HOLDER OF A CLAIM FROM SEEKING TO ENFORCE PERFORMANCE BY THE DEBTORS OR REORGANIZED DEBTORS OF THEIR OBLIGATIONS UNDER THE PLAN.

UNTIL SUCH TIME THAT THE COVID-19 OUTBREAK IS NO LONGER CHARACTERIZED BY THE WORLD HEALTH ORGANIZATION AS A PANDEMIC, ALL PARTIES-IN-INTEREST, PERSONS, ENTITIES, AGENCIES, BOARDS, BUREAUS, DEPARTMENTS, AUTHORITIES, COMPANIES, AND CORPORATIONS, INCLUDING, WITHOUT LIMITATION, THE WEST VIRGINIA HEALTH CARE AUTHORITY, THE WEST VIRGINIA HOSPITAL FINANCE AUTHORITY, THE DEPARTMENT OF REVENUE, AND THE INTERNAL REVENUE SERVICE, SHALL BE REQUIRED TO COOPERATE WITH THE DEBTORS AND/OR REORGANIZED DEBTORS IN FURTHERANCE OF THE IMPLEMENTATION OF THE PLAN WHERE PUBLIC GATHERINGS ARE REQUIRED SO THAT MEETINGS, PUBLIC HEARINGS, OR OTHER TYPES OF PUBLIC GATHERINGS CAN BE CONDUCTED BY TELEPHONE, VIDEO, TELECONFERENCE, OR OTHER REASONABLE VIRTUAL COMMUNICATIVE MEANS, UNLESS OTHERWISE WAIVED.

### M. Conditions Precedent to the Effective Date

### 1. Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

(a)     the Bankruptcy Court shall have entered the Confirmation Order and such order shall have become a Final Order and such order shall not have been amended, modified, vacated, stayed, or reversed;

(b)     the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall have been filed;

(c)   all actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws;

(d)   the 2020 Bond Documents are completed, the Series 2020 Notes are issued and delivered, and the applicable portion of the proceeds of the Series 2020 Bonds, together with the other funds of the Debtors necessary to fund the Series 2008 Bond Payment, are received by the Bond Trustee for payment to the Bondholders as specified in the Plan;

(e)   the Creditors Committee shall file a stipulation of dismissal signed by all parties who appeared in the Challenge Litigation dismissing the Challenge Litigation with prejudice effective as of the Effective Date of the Plan; and

(f)   the Debtors shall have deposited the GUC Distribution into the Segregated GUC Account.

## 2.   Waiver of Conditions Precedent

The Debtors may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time with the consent of both the Bond Trustee and Creditors Committee but otherwise without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

## 3.   *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to all Debtors, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or Claims against such Debtors, including any Claims of the Creditors Committee or Bond Trustee; (2) prejudice in any manner the rights of the Debtors, the Creditors Committee, the Bond Trustee any Holders of a Claim, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, the Creditors Committee, the Bond Trustee, any Holders, or any other Entity in any respect.

## 4.   Nonconsensual Confirmation

As to any Class that votes or is deemed to reject the Plan, the Debtors are seeking confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code either under the terms provided in the Plan or upon such terms as may exist if the Plan is modified in accordance with section 1127(d) of the Bankruptcy Code.

## N.  Modification of the Plan

Subject to the limitations contained in the Plan, the Debtors reserve the right to modify the Plan prior to Confirmation and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Notwithstanding the foregoing, (i) no such alteration, amendment or modification of the Plan shall negatively affect the terms of creditor treatment under the Global 9019 Settlement, including with respect to the GUC Distribution, or alter the claims objection process set forth in Article VII.A.2, without the prior written consent of the Creditors Committee, and (ii) no provision of the Plan relating to the Series 2008 Bonds may be altered without the prior written consent of the Bond Trustee.

## O.  Effect of Confirmation on Modifications

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

## P.  Revocation or Withdrawal of Plan

The Debtors reserve the right, upon the consent of both the Creditors Committee and Bond Trustee, to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, upon the consent of both the Creditors Committee and Bond Trustee, or if the Confirmation Date or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto or in connection herewith will be null and void in all respects; (3) the rights, obligations, challenges and objections of the Debtors, the Creditors Committee and the Bond Trustee with respect to all matters contained in the Plan and any documents executed in connection with the Plan shall otherwise be the same as the rights, obligations, challenges and objections of the aforementioned parties prior to entry of the Global 9019 Settlement, and (4) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Causes of Action, (b) prejudice in any manner the rights of any Debtor, the Creditors Committee, the Bond Trustee, or any other Entity, or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by any Debtor, the Creditors Committee, the Bond Trustee or any other Entity.

## VI.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe the Plan is in the best interests of the Creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following three alternatives may be available to the Debtors: (i) a liquidation of the Debtors' assets pursuant to chapter 7 of the Bankruptcy Code; (ii) an alternative plan of reorganization may be proposed and confirmed; or (iii) the Chapter 11 Cases may be dismissed.

### A.  Chapter 7 Liquidation

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Chapter 11 Cases may be converted to liquidation cases under chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed, pursuant to applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that such a liquidation would result in smaller distributions being made to the Creditors than those provided for in the Plan because (a) the operation of the Debtors as a going concern yields the greatest amount of funds to pay Allowed Claims, (b) additional administrative expenses attendant to the appointment of a chapter 7 trustee and the trustee's employment of attorneys and other professionals, and (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of Executory Contracts and Unexpired Leases in connection with a cessation of the Debtors' operations. The Debtors have determined that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### B.  Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors may propose a different plan, which might involve an alternative means for the reorganization or liquidation of the Debtors' assets. However, it is difficult to speculate on or assess the terms and potential treatment of Allowed Claims under any such alternative plan. Furthermore, in order for the Debtors and/or Creditors to formulate, solicit and confirm any such alternative plan would likely require the Estates to incur additional administrative and other expenses, may substantially delay distributions to Creditors, and may result in lower recoveries to Creditors than the proposed Plan. The Debtors believe that the continued operation of the Debtors pursuant to the terms of the Plan will result in the realization of the most value for Holders of Claims against the Debtors' Estates.

### C.  Dismissal of the Debtors' Chapter 11 Cases

Dismissal of the Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*. Upon dismissal of the Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the various creditors of the Debtors, and possibly resulting in costly and protracted litigation. Most significantly, dismissal of the Chapter 11 Cases would permit secured creditors to foreclose upon any Assets that are subject to

their Liens. Dismissal would also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtors. The Debtors believe that these actions could lead ultimately to the liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that dismissal of the Chapter 11 Cases is not a preferable alternative to the Plan.

## VII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF PROCEEDS FROM CLAIMS.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AGAINST THE DEBTORS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN MAY BE UNCERTAIN DUE TO, IN SOME CASES, THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE LAW. NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN, AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED BY THE DEBTORS WITH RESPECT THERETO.

THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED IN THE PLAN. ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY ENCOURAGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL, OR OTHER TAX CONSEQUENCES OF THE PLAN.

## VIII.    RISK FACTORS IN CONNECTION WITH THE PLAN

**ALL HOLDERS OF IMPAIRED CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS ASSOCIATED WITH THE PLAN AND ITS IMPLEMENTATION**.

### A.  Bankruptcy Considerations

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent set forth in the Plan, and there can be no assurance that such conditions will be satisfied or waived. In the event the conditions precedent described in the Plan have not been satisfied, or waived as of the Effective Date, then the Confirmation Order will be vacated, no distributions will be made pursuant to the Plan, and the Debtors and all Holders of Claims will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims encompass Claims that are substantially similar to the other Claims in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

As to each Impaired Class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these Classes. The Debtors believe that the Plan satisfies these requirements. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process. The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors.

## B. The Uncertainty Created by the COVID-19 Pandemic

The extraordinary and unprecedented COVID-19 pandemic and the resulting limitations and prohibitions issued by the federal government and in West Virginia have made it extremely difficult for the Debtors and their advisors to predict with any reasonable certainty the future financial performance of the Debtors.

## C. The Debtors' Actual Financial Results May Vary Significantly From the Projections

**The financial projections attached hereto reflect numerous assumptions, including the consummation of the Plan. The financial projections should be viewed in conjunction with a review of these assumptions including the qualifications set forth therein. The financial projections were prepared by management of the Debtors in good faith based upon assumptions believed to be reasonable at the time of preparation. The financial projections are based upon a variety of estimates and assumptions subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond the control of the Debtors. Actual results may vary materially from those presented. The financial projections have not been prepared to comply with the guidelines established with respect to projections by the SEC or the *AICPA*, have not been audited and are not presented in accordance with *GAAP*.**

**This Disclosure Statement contains projected financial information that demonstrates the feasibility of the Plan and the ability of the Debtors to continue operations upon emergence from proceedings under the Bankruptcy Code. Such information was prepared for the limited purpose of furnishing Holders of Claims with adequate information to make an informed judgment regarding acceptance of the Plan. None of the projections should be regarded for the purpose of this Disclosure Statement as representations or warranties by the Debtors or any other person as to the accuracy of such information or that any such projections will be realized**.

The achievement of certain results or other expectations contained in these projections involve known and unknown risks, uncertainties and other factors which may cause actual results, performances or achievements described to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. The Debtors do not plan to issue any updates or revisions to those forward-looking statements if or when changes in their expectations, or events, conditions or circumstances on which these statements are based, occur.

### D. Miscellaneous Risk Factors and Disclaimers

1. The financial information is based on the Debtors' books and records and, unless otherwise stated, no audit was performed.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

2. No legal or tax advice is provided by this Disclosure Statement.

This Disclosure Statement is not legal advice to any Person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

3. No admissions made.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims, or any other parties in interest.

4.       Failure to identify litigation claims or projected objections.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

5.       Information was provided by the Debtors and was relied upon by the Debtors' Professionals.

The Professionals retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Professionals retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

6.       No representations outside this Disclosure Statement are authorized.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure voting Holders' acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by voting Holders in arriving at their decision. Voting Holders should promptly report unauthorized representations or inducements to counsel to the Debtors and the Office of the United States Trustee for the Southern District of West Virginia.

7.       No duty to update disclosures.

The Debtors have no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, unless the Debtors are required to do so pursuant to an order of the Bankruptcy Court. Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

## IX.    RECOMMENDATION AND CONCLUSION

In the opinion of the Debtors, the Plan is preferable to other alternatives explored by the Debtors because it provides for a larger distribution to Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan, vote to accept the Plan.

**WHITEFORD TAYLOR & PRESTON LLP**

*/s/ Michael J. Roeschenthaler*
Michael J. Roeschenthaler (PA I.D. No. 87647)
200 First Avenue, Third Floor
Pittsburgh, PA 15222
(412) 618-5601 Tel.
mroeschenthaler@wtplaw.com

Brandy M. Rapp (WV Bar No. 10200)
10 S. Jefferson Street, Suite 1110
Roanoke, Virginia 24011
(540) 759-3577 Tel.
brapp@wtplaw.com

*Counsel to the Debtors and Debtors-in-Possession*

-AND-

**FROST BROWN TODD, LLC**

Jared M. Tully, Esq. (WV Bar No. 9444)
500 Virginia Street East, Suite 1100
Charleston, WV 25301
304-345-0111 (phone)
jtully@fbtlaw.com

Douglas L. Lutz, Esq. (Ohio Bar No. 0064761)
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
513-651-6800 Telephone
dlutz@fbtlaw.com

*Local Counsel to the Debtors and
Debtors-in-Possession*

*11422736*